OLD OMAHA ASSOCIATION, A NEBRASKA NONPROFIT
CORPORATION, APPELLANT, V. CITY OF OMAHA, A MUNICIPAL
CORPORATION, ET AL., APPELLEES.
513 N.W.2d 329

Filed March 8, 1994.   No. A-91-901.

John B. Ashford, of Bradford, Coenen & Ashford, and Mark W. Mercer for appellant.

Herbert M. Fitle, Omaha City Attorney, and Charles K. Bunger for appellees.

SIEVERS, Chief Judge, and IRWIN and MILLER-LERMAN, Judges.

SIEVERS, Chief Judge.

With this lawsuit, Old Omaha Association (Association) seeks to stop the City of Omaha (City) from building a multilevel parking garage in the Old Market area of Omaha. The Association sued to enjoin the City from using the power of eminent domain to acquire the surface parking lot which the Association now owns and operates, and upon which the City proposes to build a multilevel parking facility. The district court for Douglas County denied the Association's request for injunctive relief. A timely appeal was perfected to this court.

## FACTUAL BACKGROUND

The Old Market area of Omaha is a district of retail shops, dining and entertainment establishments, and residential quarters, which area was formerly Omaha's wholesale produce and public market, originally developed during the last two decades of the 19th century. Most of the old buildings which had fallen into disuse and disrepair have been restored and preserved so that the original character and structural appearance of the buildings have been retained while the area itself has been transformed. The evidence is that the Old Market is now the city's most frequented historical site as well as a greatly popular shopping, dining, and entertainment destination.

The land at the heart of this controversy is Lots 1 through 4, Block 152, Original City of Omaha, which lots are located within the Burlington-Old Market Redevelopment Plan (Burlington Plan) area. This plan was adopted November 2, 1976, by the City pursuant to the Community Development Law, Neb. Rev. Stat. § 18-2101 et seq. (Reissue 1991, Cum. Supp. 1992, & Supp. 1993).

The Burlington Plan states as follows with respect to the subject of parking:

> The primary circulation problem facing the Burlington-Old Market Area at the present time is the lack of adequate vehicle parking space. This problem can be relieved to a small extent by rearranging existing curb-side spaces from parallel to diagonal parking. However, the most ideal solution is the designation and development of adequate off-street parking facilities as provided in this redevelopment plan. Some public participation in site acquisition may be necessary in order to insure that sufficient off-street parking is provided as additional restoration and redevelopment take place.

The plan, in the section entitled "Capital Improvement Program," provided for parking lot development in the amount of $187,500 for site acquisition and $254,700 for improvements, to be funded by a community development block grant and private funding, respectively. Several drawings which are part of the plan show proposed parking at the site now owned by the Association.

Pursuant to the Community Development Law, the land at issue was declared in the Burlington Plan to be "substandard and in need of redevelopment." The City acquired the premises by condemnation in 1978, except for the eastern 22 feet of Lot 4, Block 152. Proposals for the construction of a parking facility at 10th and Harney Streets, the location of the involved premises, were solicited by the City. The Association responded with a proposal dated December 6, 1978, for the construction and operation of a parking facility. The statement of purpose of the proposal recognized that there was an "acute need for adequate parking facilities" within the Old Market area and proposed a three-phase project beginning with a surface

parking lot with 104 customer spaces and 28 spaces reserved for long-term rental. The first phase was to be operational within 1 year from the date of possession. In the second phase, within 1 to 5 years, there would be landscaping, lighting, and "initial construction of multi-use facilities . . . as long as the parking facility provides adequate spaces for customer parking . . . ." Shops, restaurants, and apartments were the proposed "multi-use facilities for the area." The Association's proposal for the third phase, within 5 to 20 years, was "the possible installation . . . of a multi-level parking structure with additional multi-use structures."

On December 26, 1978, the City and the Association entered into a redevelopment agreement under the authority of the Community Development Law. On March 1, 1979, the City deeded the property to the Association by warranty deed, and on October 28, 1981, Samuel D. Mercer, who had acquired the eastern 22 feet of Lot 4, Block 152, deeded it to the Association, thereby placing the entire parking lot premises under the ownership of the Association. Since 1979, the Association had operated the premises as a surface parking facility for the general public. In 1984, the Association and the Artists Cooperative Gallery began operating an art gallery in a garage space on the premises. Additionally, between the years 1985 and 1987, the Association developed a sculpture garden across the alley from the parking lot.

In April 1988, the Omaha City Council adopted by resolution the Downtown East Redevelopment Plan (Downtown East Plan), covering an area bounded by Capitol Avenue on the north, 10th Street on the east, Leavenworth Street on the south, and 14th Street on the west. The area included the Association's parking lot. This plan recited that the "area is located within the Central Business District which has been declared a 'blighted and substandard' area in need of redevelopment pursuant to the Nebraska Community Development Law." The plan documents asserted that the area involved has "experienced substantial redevelopment and revitalization within the last ten years." The plan made extensive reference to the Central Park Mall and its impact on the area in conjunction with the Old Market located close by.

The plan extensively discussed the four districts within the area: the South Frame, the Old Market, the Central Park Mall, and the North Frame.

We quote the Downtown East Plan on the Old Market section with reference to parking:

> 3. New Development: While the Old Market puts an overwhelming emphasis on adaptive reuse projects, it presents some opportunities for new development. The most strategic of these is the Old Market parking lot, south of Harney between 10th and 11th Streets. Possible development for this site could include a public parking structure, with retail use along the important 11th Street frontage. Any new development in the Old Market must complement the scale, materials, and design of the historic core of the district.

Public notice of the Downtown East Plan was published and a hearing set before the city council on April 19, 1988, which resulted in the adoption of the plan.

In early 1990, the City announced its intention to construct a multilevel parking garage on the site occupied by the Association's parking facility. On April 10, 1990, the Omaha City Council approved the necessity ordinance which expressly authorized the taking by eminent domain of the Association's land should negotiations for acquisition be unsuccessful. The ordinance, No. 32037, provided that the purpose of the acquisition was for "redevelopment, parking and other public purposes." The Downtown East Plan, in the section entitled "Project Implementation," states: "1. The City will use its power of eminent domain, if necessary, pursuant to the authority granted it by Sections 18-2107 and 18-2122 of the Nebraska Community Development Law, to assemble property within Redevelopment Project Area One." Redevelopment Project Area One covers Lots 1 through 7 of Block 135 and all of Block 136, Original City of Omaha, which is different from the Association's land at issue here. The Downtown East Plan specifically details the first step of the plan, entitled "Redevelopment Project Area One," which is the construction of an office and computer center between 13th and 11th Streets and between Harney and Farnam Streets, which area is located

in the Central Park Mall district. According to the plan, "The project envisions up to 820,000 suare [sic] feet of office and computer center space, along with additional structured parking."

On August 10, 1990, the City notified the Association by letter of its intention to acquire the Association's parking lot, citing the Community Development Law, the Downtown East Plan passed by the city council on April 19, 1988, and the necessity ordinance. The letter contained an offer in the amount of $600,000 for compensation for the taking. Four days later, the City sent the Association a 90-day notice to vacate. The notice stated that "[t]o carry out the Old Market Parking Garage Project it will be necessary for you to move." The Association was to remove its personal property from the site on or after November 14, 1990.

On November 2, 1990, the City filed in the Douglas County Court its notice of intention to acquire the property. The notice also set a November 20 meeting of the board of appraisers to assess damages for the taking of the Association's property. This lawsuit was filed on November 14 in the district court for Douglas County to enjoin the assessment proceedings and to enjoin the City from using its power of eminent domain to acquire the Association's property.

## ASSIGNMENTS OF ERROR

The Association contends that the trial court erred in concluding that the City can use the offstreet parking statutes, Neb. Rev. Stat. § 14-1731 et seq. (Reissue 1991), to condemn its parking facility. Next, the Association contends that the trial court erred in failing to find that the City was bound by the Community Development Law and its December 26, 1978, redevelopment agreement with the Association. The Association claims error in the district court's failure to find that its consent was required to change the 1978 redevelopment agreement. The Association also contends that the trial court erred in finding that "the redevelopment plan had not been modified by the Appellee's garage plan." Finally, error is assigned in the finding in favor of the City.

## STANDARD OF REVIEW

■ An action for an injunction sounds in equity, and in an equity action, an appellate court reviews the record de novo. *Village of Brady v. Melcher*, 243 Neb. 728, 502 N.W.2d 458 (1993). In such de novo review, the appellate court reaches conclusions independent of the factual findings of the trial court. However, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

■ With regard to questions of law, the appellate court is obligated to reach conclusions independent of the decision reached by the trial court. *Id.*

The record in this case consists primarily of extensive documents placed in evidence by stipulation.

## ANALYSIS

### OFFSTREET PARKING STATUTES

The district court denied the Association's claim for an injunction to prevent the condemnation of its property on the basis that the City had "independent power to condemn under the Off-Street Parking Act." The Association claims that the district court erred in finding that the offstreet parking statutes, § 14-1731 et seq., allowed the City to acquire the property. Omaha, with a population well in excess of 300,000, is a city of the metropolitan class. See Neb. Rev. Stat. § 14-101 (Reissue 1991).

The statutes relating to offstreet parking, with respect to such cities, were enacted in 1971, and the Legislature provided that it was "deemed necessary and of general benefit to the entire State of Nebraska to provide means for such cities to own offstreet vehicle parking facilities exclusively for the parking of motor vehicles." § 14-1731. The heart of the offstreet parking statutes is § 14-1732, which provides:

> Any city of the metropolitan class is hereby authorized to own, purchase, construct, equip, lease, or operate within such city offstreet motor vehicle parking facilities on property . . . owned by the city and used in conjunction

with and incidental to city-operated facilities, or on property situated so as to serve business in the central business district, or business in long-established outlying neighborhood business districts for the use of the general public. The grant of power in this section does not include the power to engage, directly or indirectly, in the sale of gasoline, oil or other merchandise or in the furnishing of any service other than that of parking motor vehicles as provided herein. *Any such city shall have the authority to acquire by grant, contract, or purchase, as provided by law for such acquisition, all real or personal property, including a site or sites on which to construct such facilities, necessary or convenient in the carrying out of this grant of power.*

(Emphasis supplied.)

We note initially that the offstreet parking statutes have not been construed or discussed by the Nebraska Supreme Court. However, the Parking Authority Law, Neb. Rev. Stat. § 14-1701 et seq. (Reissue 1991), dealing with parking below county courthouses and on abutting streets, was found to be constitutional in *Omaha Parking Authority v. City of Omaha*, 163 Neb. 97, 77 N.W.2d 862 (1956). In that case, the Supreme Court held: "We are of the opinion that subway parking and off-street parking constitute a public use, and in providing them, a public function is being accomplished." *Id.* at 107, 77 N.W.2d at 870. Nearly 40 years later, with more people and motor vehicles, that conclusion is obviously no less valid. However, the Parking Authority Law expressly provides that the parking authority created thereby does not have the power of eminent domain. § 14-1707(12).

The language which we have emphasized above from § 14-1732 of the offstreet parking statutes does not provide for an express grant of the power of eminent domain by precise use of the words "eminent domain," nor does it expressly deny the power, as in the Parking Authority Law. Nonetheless, we are of the opinion that a city of the metropolitan class such as Omaha does have the power to forcibly acquire privately owned land by eminent domain for a city-owned offstreet parking facility.

The power of eminent domain has been described as the

right of a nation or state, or of those to whom the power has been lawfully delegated, to condemn private property for public use and to appropriate its use and ownership upon paying the owner due compensation. It has also been characterized as one of the highest powers of government and as an attribute of sovereignty. 29A C.J.S. *Eminent Domain* § 1 (1992). See, also, *State ex rel. Nelson v. Butler*, 145 Neb. 638, 17 N.W.2d 683 (1945).

■ "The right to exercise the power of eminent domain must be conferred by statute, either in express words or by necessary implication. Such power being in derogation of common right, the acts conferring are to be strictly construed in favor of the landowner." *Heppe v. State*, 162 Neb. 403, 408, 76 N.W.2d 255, 259 (1956).

Neb. Rev. Stat. § 14-366 (Reissue 1991) contains the general delegation by the Legislature of the power of eminent domain to cities of the metropolitan class:

> The city may purchase or acquire by the exercise of the power of eminent domain private property or public property which is not at the time devoted to a specific public use, for the following purposes and uses: (1) For streets, alleys, avenues, parks, recreational areas, parkways, playgrounds, boulevards, sewers, public squares, market places, and *for other needed public uses or purposes authorized by this act*, and for adding to, enlarging, widening, or extending any of the foregoing; and (2) for constructing or enlarging waterworks, gas plants, or other municipal utility purposes or enterprises authorized by this act. . . .

(Emphasis supplied.)

The Legislature has seen fit, through the offstreet parking statutes, to provide the means for cities of the metropolitan class to own offstreet vehicle parking facilities:

> State recognition is hereby given to the hazard created in the streets of cities of the metropolitan class by the great increase in the number of motor vehicles, buses, and trucks. In order to remove or reduce the hazards of life and property and the inconvenience of congested traffic on the streets in such cities in this state, it is hereby deemed

necessary and of general benefit to the entire State of Nebraska to provide means for such cities to own offstreet vehicle parking facilities exclusively for the parking of motor vehicles.

§ 14-1731.

The offstreet parking statutes also expressly provide that any city of the metropolitan class is authorized to

own, purchase, construct . . . or operate within such city offstreet motor vehicle parking facilities on property . . . situated so as to serve business in the central business district, or business in long-established outlying neighborhood business districts for the use of the general public. . . . Any such city shall have the authority to acquire by grant, contract, or purchase, as provided by law for such acquisition, all real or personal property, including a site or sites on which to construct such facilities, necessary or convenient in the carrying out of this grant of power.

§ 14-1732.

Therefore, although the offstreet parking statutes do not contain an express grant of the power of eminent domain, it is clear that the Legislature may delegate such power, either by express words or "necessary implication." See *Heppe v. State, supra.* When §§ 14-1731 and 14-1732 are read in conjunction with the grant of the general power of eminent domain in § 14-366 to cities of the metropolitan class, we conclude that there is a grant by necessary implication of the power of eminent domain for the purpose of acquiring land to own and operate an offstreet parking facility.

Neb. Rev. Stat. § 14-367 (Reissue 1991) requires that the purchase of property by eminent domain under § 14-366 shall be made by ordinance and that "the purpose and necessity for such appropriation shall be declared by ordinance." The record in the present case shows that ordinance No. 32037, passed April 10, 1990, provides for the taking of the Association's property under the power of eminent domain and declares "the necessity of appropriating, for the use of the City of Omaha and redevelopment pursuant to the Downtown East Redevelopment Plan and the Nebraska Off Street Parking Act,

certain properties located at the Southwest corner of 10th and Harney Streets . . . ." The ordinance specifically describes the property involved in this litigation and states that the property "will be utilized for redevelopment, parking and other public purposes." Accordingly, the declaration of purpose and necessity required by § 14-367 has been fulfilled by the City. We find that the offstreet parking statutes allow the condemnation of the Association's property.

The power of eminent domain found in the offstreet parking statutes is "supplementary to existing statutes relating to cities of the metropolitan class and confer[s] upon such cities powers not heretofore granted." § 14-1740. Thus, we now turn to the Community Development Law.

COMMUNITY DEVELOPMENT LAW

■ We begin our analysis with the Supreme Court's opinion in *Monarch Chemical Works, Inc. v. City of Omaha*, 203 Neb. 33, 277 N.W.2d 423 (1979). That case summarizes Nebraska's Community Development Law, § 18-2101 et seq., as follows:

> In a general way, this law authorizes a city to define and acquire substandard or blighted areas and redevelop them in accordance with an approved redevelopment plan which in turn shall conform to the general plan for the municipality as a whole. Section 18-2103 (12), R. R. S. 1943, provides in part as follows: "Redevelopment project shall mean any work or undertaking in one or more urban renewal areas: (a) To acquire substandard or blighted areas or portions thereof, including lands, structures, or improvements the acquisition of which is necessary or incidental to the proper clearance, development, or redevelopment of such substandard or blighted areas; * * * (c) to sell, lease, or otherwise make available land in such areas for residential, recreational, commercial, industrial, or other use or for public use or to retain such land for public use, in accordance with a redevelopment plan; * * * (d) to acquire real property in an urban renewal area which, under the redevelopment plan, is to be repaired or rehabilitated for dwelling use or related facilities, repair or rehabilitate the structures, and resell the property; * * *."

203 Neb. at 36-37, 277 N.W.2d at 425-26.

*Monarch Chemical Works, Inc.* also holds that the acquisition of lands for slum elimination, slum prevention, rehabilitation of substandard areas for low-cost housing, community development, or industrial development are legitimate public purposes. In so holding, the court quoted with approval from *Chi. Land Clearance Com. v. White*, 411 Ill. 310, 104 N.E.2d 236 (1952):

> "Quite appropriate is this statement appearing in the Zurn case [*Zurn v. City of Chicago*, 389 Ill. 114, 129, 59 N.E.2d 18, 25 (1945)]: 'The redevelopment of slum and blight areas, * * * constitutes a public use and a public purpose, regardless of the use which may be made of the property after the redevelopment has been achieved.' "

203 Neb. at 40-41, 277 N.W.2d at 427.

In *Monarch Chemical Works, Inc.*, the owner of industrial property filed an action to enjoin the condemnation of its land instituted under the authority of the Community Development Law by the City of Omaha. The attempted condemnation was in conjunction with the State of Nebraska's selection of the property as the site for a proposed medium-minimum security penal complex, but the negotiations for the acquisition of the property were not successful, and as a consequence, the city and the state entered into a contract which, in essence, provided that the state would pay for the city to acquire the property. However, the East Omaha Redevelopment Plan was not amended to include a change of purpose of the plan so as to develop a portion of the East Omaha area as a penal complex, nor to delete that portion of the plan which provided that " '[p]roperty owned by resident industries and businesses for their future expansion . . . will not be purchased.' " *Id.* at 38, 277 N.W.2d at 426. Monarch's evidence was that the property in question was being held for the future construction of asphalt-storage tanks. The Supreme Court affirmed the district court's granting of the injunction, saying that "it would seem apparent that the acquisition of property whether by voluntary methods or by eminent domain to carry out a redevelopment plan must be provided for in and be in accordance with such plan." *Id.* at 41, 277 N.W.2d at 428. The authority to acquire

Monarch's land was not provided for in the East Omaha Redevelopment Plan in order to carry out the purposes of the plan, but solely as an accommodation to the state to acquire a site for a penal complex which had nothing to do with the redevelopment plan. The plan itself expressly denied the need or purpose of acquiring land which, like Monarch's, fell into the category of " '[p]roperty owned by resident industries for their future expansion.' " *Id.* at 42, 277 N.W.2d at 428. The court concluded that the attempted condemnation of Monarch's land could not be sustained.

The property at issue in this case was originally acquired from its then owner under the Burlington Plan, passed November 2, 1976. Our review of that plan shows that the matter of parking is clearly a feature of the original plan for the redevelopment of the Old Market area. A surface lot was utilized, but the City's solicitation of proposals, as well as the Association's response, shows that a multilevel parking facility was contemplated as redevelopment proceeded. In the more recent Downtown East Plan, adopted in April 1988, there are extensive details with respect to Redevelopment Project Area One, covering Lots 1 through 7 of Block 135 and all of Block 136, for the construction of an office and computer center. Although Redevelopment Project Area One, the office and computer center, does not encompass the Association's property, it is nonetheless clear from the Downtown East Plan that the overall redevelopment and growth of the Old Market area has proceeded to the point that more parking is needed. In a section of the Downtown East Plan entitled "New Development," the reference to parking is clear, as it states that possible development of the Association's site "could include a public parking structure, with retail use along the important 11th Street frontage."

A multilevel parking garage with retail space on the first floor located at the Association's site was contemplated as early as 1978, when the City was soliciting proposals for parking facilities on the site in question, and the Association proposed a multilevel facility in response to this solicitation. Accordingly, in contrast to *Monarch Chemical Works, Inc. v. City of Omaha*, 203 Neb. 33, 277 N.W.2d 423 (1979), the Burlington

Plan and the Downtown East Plan, both adopted under the Community Development Law, contemplated that the Association's land would be used for the development of a multilevel parking facility.

## EQUITABLE ESTOPPEL

Although the Association did not plead equitable estoppel as part of its cause of action for an injunction, it does argue that doctrine, apparently as part of its assignment of error that the trial court erred in finding for the City. Although the general rule is that an equitable estoppel must be pleaded in order to be available, *Burwell Irrigation Co. v. Lashmett*, 59 Neb. 605, 81 N.W. 617 (1900), it is true that a party entitled to an estoppel need not in all cases formally plead it, *Greer v. Chelewski*, 162 Neb. 450, 76 N.W.2d 438 (1956). Therefore, we speak to the matter briefly.

An equitable estoppel rests largely on the facts and circumstances of a particular case and will be applied where the wisdom and justice of the principle are founded upon equity, morality, and justice in accordance with good conscience, honesty, and reason. Under such circumstances, the doctrine subserves its true purpose as a practical, fair, and necessary rule of law. *Koop v. City of Omaha*, 173 Neb. 633, 114 N.W.2d 380 (1962). As we understand the equitable estoppel argument being advanced by the Association, it is that the Association relied on the redevelopment agreement of December 26, 1978, and performed under it to the City's benefit and that a change in that redevelopment plan to condemn the land in question "would quite simply hold the Community Development Act to be a nullity upon which no developer could rely." Brief for appellant at 36. However, the Association does not explain how equity and good conscience would be offended by the erection of a multilevel parking facility at the location when precisely such a facility was proposed by the Association on December 6, 1978, as part of its third-phase development of the site.

Furthermore, equitable estoppel would restrain the sovereign power of eminent domain; however, there are few such restraints. We repeat the admonition of the Supreme Court in *Hammer v. Department of Roads*, 175 Neb. 178, 182,

120 N.W.2d 909, 913 (1963), that "[t]here is no constitutional limitation in this state on the right to take private property for public use under the power of eminent domain, except as to the right to just compensation." As pointed out in *May v. City of Kearney*, 145 Neb. 475, 502, 17 N.W.2d 448, 463 (1945), the state has the right to take a person's property against his or her will:

> The state needs the property and takes it, and while the citizen cannot resist, he has the right to insist upon just compensation to be ascertained by an impartial tribunal . . . . He has a right to his day in court on the question of compensation, but he has no right to a day in court on the question of appropriation by the state unless some statute requires it.

If this were public property devoted to a specific public use, the language of § 14-366 would restrict the City's power of eminent domain. Although the Association's surface parking lot is admittedly a public use, it is private property which is still subject to condemnation under § 14-366. We find no factual or statutory basis upon which to say that the City is equitably estopped from condemning the Association's land.

### MODIFICATION AND CONSENT

We now turn to the matter of whether the redevelopment agreement of December 26, 1978, between the City and the Association prevents the City from now condemning the property for a second time. The Association argues that under § 18-2117 of the Community Development Law, the change from a surface parking lot which it operates to a multilevel parking garage with retail facilities is a modification which requires the Association's consent. Section 18-2117 provides in relevant part:

> A redevelopment plan may be modified at any time by the authority; *Provided,* that if modified after the lease or sale of real property in the redevelopment project area, the modification must be consented to by the redeveloper or redevelopers of such real property or his successor, or their successors, in interest affected by the proposed modification.

The City's contention that no modification is occurring and thus no consent is needed has two prongs. The first prong is that the original redevelopment plan, the Burlington Plan, adopted November 2, 1976, does not need to be modified to accomplish a multilevel parking facility. The second prong of the City's argument is that the second redevelopment plan, the Downtown East Plan, is consistent with the Burlington Plan because the second plan refers to the Association's site and states: "Possible development for this site could include a public parking structure, with retail use along the important 11th Street frontage."

The Burlington Plan, in the section entitled "FUTURE LAND USE," states:

Future land use distribution will not only be mixed throughout the area, but also within individual structures. The typical situation will find *commercial or office usage on the ground floor*, offices above, and residential apartments and condominiums on the upper floors. *In addition, adequate areas for automobile storage, both within individual buildings and throughout the area, will need to be developed.*

(Emphasis supplied.)

In the section entitled "PUBLIC IMPROVEMENTS," under the subset "Vehicle Circulation," the plan also states:

The primary circulation problem facing the Burlington-Old Market Area at the present time is the lack of adequate vehicle parking space. This problem can be relieved to a small extent by rearranging existing curb-side spaces from parallel to diagonal parking. However, *the most ideal solution is the designation and development of adequate off-street parking facilities as provided in this redevelopment plan.* Some public participation in site acquisition may be necessary in order to insure that sufficient off-street parking is provided as additional restoration and redevelopment take place.

(Emphasis supplied.)

Obviously, the 1976 plan painted with a broad brush concerning the matter of parking. Nonetheless, it is clear that it was contemplated that the development of parking facilities

would be an ongoing process as the Old Market area was redeveloped and that ground level commercial or retail space was also contemplated. As evidence thereof, we observe that the request for proposals for the construction of a parking facility at 10th and Harney Streets, to which the Association submitted its proposal of December 6, 1978, provided "proposals for a multi-level parking structure would be welcomed." That the Burlington Plan does not specifically reference a multilevel parking facility does not mean that there is a modification under § 18-2117 requiring the Association's consent. The provision of parking facilities as the Old Market area redeveloped was always a central and necessary feature of the Burlington Plan. We do not believe that the plan has been modified by the change from a surface lot to a multilevel lot so as to trigger the consent requirement of § 18-2117. Instead, the change simply shows that the Old Market is being successfully redeveloped, requiring more parking. The original Burlington Plan contemplated parking expansion as Old Market redevelopment occurred. The Association's consent is not needed because there is no modification—the land at 10th and Harney Streets is still a parking facility, whether a surface lot or multiple levels. Additionally, condemnation is also premised upon the offstreet parking statutes, and thus the consent requirements of § 18-2117 of the Community Development Law would not be involved in any event.

## Retail Use

The Association asserts, in effect, that even if there is a proper taking under the offstreet parking statutes, the taking cannot be for retail purposes such as is proposed by the city planner in his testimony regarding the ground level along 11th Street of the future multilevel parking facility. Gregory Peterson, city planner for the City, testified that the project which the City proposes to build on the Association's land will be a six-level parking facility with about 5,000 square feet along the 11th Street frontage that "could be used for any variety of activities, to provide life and excitement as a pedestrian walks by along that street." Peterson testified to the importance of having a "store front" along 11th Street so that pedestrians who are working their way back and forth between the Old Market

and the Central Park Mall would not have to look at a blank wall which a parking garage would normally afford. Peterson testified that it was felt to be "very important to have a series of store fronts along there [11th Street] so that a pedestrian has something to relate to, a store front, some activity going on, et cetera, rather than a blank wall."

The ordinance of necessity states that "this property will be utilized for redevelopment, parking and other public purposes," and we conclude that under the Community Development Law, redevelopment can quite obviously include retail use. We observe that the land involved in this case was originally declared "underdeveloped and substandard" when the Burlington Plan was adopted by the Omaha City Council on November 2, 1976. *Monarch Chemical Works, Inc. v. City of Omaha*, 203 Neb. 33, 41, 277 N.W.2d 423, 428 (1979), holds that

> [t]he taking of substandard or blighted areas by a city for redevelopment and resale in accordance with an approved redevelopment plan which is in conformity with a general plan for the municipality as a whole, all as provided for in the Nebraska Community Development Law, § 18-2101 et seq., R. R. S. 1943, is a proper public use for a municipality.

Upon review of the Burlington Plan, we cannot realistically dispute that its core purpose is to encourage development of a mixed variety of commercial office, retail, and residential activities in the area. The development of such activities carries the need for increased parking space as the redevelopment occurs.

## CONCLUSION

Accordingly, we conclude that the Community Development Law, the offstreet parking statutes, the Burlington Plan, and the Downtown East Plan allow the acquisition of the Association's site by the use of the power of eminent domain, as well as allow the development of a facility which provides increased parking through multiple levels and the establishment of commercial or retail space on the first floor of that facility. The district court was correct in denying injunctive relief.

AFFIRMED.