CITY OF LAS VEGAS DOWNTOWN REDEVELOPMENT AGENCY, Appellant, v. JAMES R. CROCKETT, SR., AILEEN M. CROCKETT, and ATLANTIC PENSION FUND SERVICES, Respondents.

No. 27801

CITY OF LAS VEGAS DOWNTOWN REDEVELOPMENT AGENCY, Appellant, v. PAUL MOLDON and LAUREL MOLDON, Respondents.

No. 27941

CITY OF LAS VEGAS DOWNTOWN REDEVELOPMENT AGENCY, Appellant, v. JAMES R. CROCKETT, SR., AILEEN M. CROCKETT, and ATLANTIC PENSION FUND SERVICES, Respondents.

No. 29550

November 15, 2001                                         34 P.3d 553

*Bradford R. Jerbic,* City Attorney, and *William P. Henry,* Senior Litigation Counsel, Las Vegas; *Beckley, Singleton, Chtd.,* and *Daniel F. Polsenberg* and *Rex A. Jemison,* Las Vegas, for Appellant.

*Netzorg & Caschette,* Las Vegas, for Respondents James and Aileen Crockett and Atlantic Pension Fund Services.

*Chuck R. Gardner,* Las Vegas, for Respondents Paul and Laurel Moldon.

# OPINION

*Per Curiam:*

At issue in these consolidated appeals is whether the Redevelopment Plan for the Downtown Las Vegas Redevelopment Area (the "Redevelopment Plan") must be amended to include a project for redevelopment that contemplates vacating portions of four public streets and relocating a public park. Amendment is necessary only when the contemplated redevelopment actions materially deviate from or change the applicable redevelopment plan. Thus, we conclude that no amendment of the Redevelopment Plan was required in this instance because the vacation of the four streets and the relocation of the park do not constitute a material deviation from or change to the Redevelopment Plan. Consequently, we reverse the district court's orders of dismissal.

## FACTUAL AND PROCEDURAL HISTORY

Citing the need to eliminate "environmental deficiencies and blight," the Las Vegas City Council adopted Ordinance No. 3218 on March 5, 1986, approving the Redevelopment Plan. The redevelopment area initially comprised 2,401 acres and was bounded on the north by Washington Avenue, on the east by Bruce Avenue, on the south by Sahara Avenue, and on the west by Highland Drive. A description of the Redevelopment Plan's area and a statement that proceedings for redevelopment had been instituted were filed in the Clark County Recorder's office.

The forty-two-page Redevelopment Plan was prepared by the City of Las Vegas Downtown Redevelopment. Agency (the "Agency"). As an introductory note, the Agency explained that the Redevelopment Plan would serve as a template for future redevelopment, the specifics of which would be added on a case-by-case basis:

> Because of the long-term nature of this Plan [40 years], and the need to retain in the Agency flexibility to respond to market and economic conditions, property owners and developer interests and opportunities from time to time presented for redevelopment, this Plan does not present a precise plan or

establish specific projects for the redevelopment, rehabilitation and revitalization of any area within the Redevelopment Area. Instead, this Plan presents a process and a basic framework within which specific plans will be presented, specific projects will be established, and specific solutions will be proposed, and by which tools are provided to the Agency to fashion, develop, and proceed with such specific plans, projects and solutions.

The Redevelopment Plan's reach is substantial: "All real property" in the redevelopment area is subject to its controls and requirements.[1] To eliminate and prevent the spread of blight and deterioration, the Redevelopment Plan contemplates, among numerous other things, the Agency's acquisition of real property by purchase or eminent domain, the transfer of acquired real property to public or private entities for development, demolition of buildings or other real property improvements, construction of parks, development and construction of hotel and "tourism/recreational" facilities, and the widening, closure and vacation of streets and alleys. The City of Las Vegas must assist the Agency in implementing the Redevelopment Plan in various ways, including widening, closing and vacating streets and alleys in the redevelopment area.

The Redevelopment Plan authorizes the Agency to finance redevelopment projects with local, state, and federal funds, and with loans from private financial institutions. Real property owners and tenants within the redevelopment area may participate in redevelopment activities by entering into binding agreements with the Agency to rehabilitate or develop their existing or acquired properties.

In August 1994, members of the Agency convened for a public hearing on a redevelopment project proposed by the Stratosphere Corporation ("Stratosphere"). A Stratosphere representative explained that construction of a hotel and base building, to be connected to the existing Stratosphere Tower, would require the Agency's acquisition of certain neighboring properties for delivery to Stratosphere. An Agency staff report noted that approval of the project would require the Agency's acquisition and transfer of seventeen parcels to Stratosphere. These parcels include respondents' properties.

Following another public hearing, the Agency approved Stratosphere's project, finding it consistent with the

[1]See NRS 279.576(1) (stating that a redevelopment plan may provide for the agency to acquire "all or part of the real property in the redevelopment area, and any personal property acquired in connection with that real property").

Redevelopment Plan's objectives. In December 1994, the Agency executed an Owner Participation Agreement ("OPA") with Stratosphere. The OPA's stated purpose was to effectuate the Redevelopment Plan through Stratosphere's development of two sites adjacent to the Stratosphere Tower and within the redevelopment area. On the first site, Stratosphere was to construct a hotel/casino on property it already owned or controlled and on eleven acres of property to be acquired by the Agency and conveyed to Stratosphere.[2] On the second site, Stratosphere was to construct a public park (to replace a park already located somewhere in the project area) on property it already owned or controlled and on property to be acquired by and for the Agency. The new park was required to be of equal or better quality than the existing park, and all the "monuments and plaques" at the existing park had to be relocated to the new park. Stratosphere was further obligated to convey, "without cost," its site-two property to the Agency, and to convey to the Agency a community center owned by Stratosphere and located next to the second site.

The OPA's site designations required the City of Las Vegas to vacate portions of four streets within the redevelopment area: St. Louis Avenue, Boston Avenue, Commerce Street, and Fairfield Avenue. The OPA also required Stratosphere to finance the costs of construction and the costs of acquiring the necessary properties, and directed the Agency to acquire those properties—through condemnation if necessary.

The Agency did not amend the Redevelopment Plan to reflect Stratosphere's project. Nor had the Agency amended the Redevelopment Plan to reflect eleven prior redevelopment projects within the redevelopment area.

The Redevelopment Plan has been amended only twice since its approval. In 1988, the redevelopment area was expanded to include property (apparently, 234 acres) northwest of the original redevelopment area. In 1992, certain land use designations and definitions contained in the Redevelopment Plan were changed to conform to the City of Las Vegas' amended master plan.

In April 1995, the Agency filed an eminent domain complaint against respondents Paul and Laurel Moldon, alleging that the Moldons' 1806 South Main Street commercial property was needed for "redevelopment purposes," and that the Agency was unable to reach an agreement with the Moldons to purchase the property. In May 1995, the Agency filed a similar complaint against respondents James R. Crockett, Sr., Aileen M. Crockett, and Atlantic Pension Fund Services ("APFS"), seeking to con-

---

[2]According to Stratosphere's executive vice-president, Stratosphere was successful in acquiring, on its own before execution of the OPA, "several of the properties which make up a part of the . . . 11 acres."

demn their 1811 South Commerce Street property, formerly a local car dealership's service garage. Both properties are located within an area designated by the Redevelopment Plan as "Tourist Commercial," for "uses which primarily derive revenue from or are oriented toward visitors to the community." The complaints were accompanied by motions for occupancy of the properties pending entry of a condemnation judgment.

The Crocketts and APFS opposed the motion for occupancy and moved to dismiss the complaint. They argued, in part, that because Stratosphere's project was not contemplated in the Redevelopment Plan, the Agency had to amend the Redevelopment Plan before proceeding in eminent domain.

The district court granted the motion to dismiss, stating that it had only considered whether the changes that Stratosphere's project imposed on the Redevelopment Plan, with respect to the treatment of streets, open spaces, and public areas, require amendment of the Redevelopment Plan. The district court formulated a "materiality" test to assess when changes to a redevelopment plan trigger the formal amendment process:

> [B]ecause the Nevada Legislature [has] expressly and unambiguously provided . . . that redevelopment plans *must* be specific with regard to . . . the layout of streets, open spaces, and public places[ ], and because redevelopment plans are required to be specific at the time public hearings are initially conducted, it follows that any material change to a previously adopted redevelopment plan with regard to the same subject matter *necessarily* requires that the [statutory] amendment and public hearing provisions . . . be satisfied.

Thus, the district court found that, insofar as Stratosphere's project required "the vacation of four public streets and a public park," amendment of the Redevelopment Plan was an indispensable predicate to condemnation of the Crocketts and APFS' property.

The Moldons did not oppose the Agency's motion for occupancy pending judgment; consequently, the district court granted the motion. Nearly two months later, however, after the district court had granted the Crocketts and APFS' motion to dismiss, the Moldons moved to dismiss the Agency's eminent domain complaint, repeating the argument that Stratosphere's project was not part of any redevelopment plan. The Agency opposed the motion, filing affidavits signed by the executive directors of the California Redevelopment Association and the City of Reno's Redevelopment Agency. The directors testified that (1) redevelopment plans are kept general both to ensure that a redevelopment agency can react to changing development conditions and opportunities, and to

avoid the need for amendment upon each transaction for redevelopment negotiated with developers and private property owners; (2) amendment of a redevelopment plan is a lengthy and cumbersome process, requiring months to accomplish; and (3) requiring the amendment of a redevelopment plan for every redevelopment transaction would consume all of the agency's resources and make it impossible to react to redevelopment opportunities with speed and flexibility. Nevertheless, the district court granted the Moldons' motion to dismiss, apparently for the same reason it had granted the Crocketts and APFS' motion. The district court also rescinded its order of occupancy.

The Agency appealed both dismissal orders. It also appealed the district court's denial of its motion for NRCP 60(b) relief in the Crockett and APFS case. This court consolidated all three appeals. Because the Agency has not advanced on appeal any argument concerning the propriety of the district court's denial of NRCP 60(b) relief, any error concerning that denial is deemed waived.[3]

## DISCUSSION

### Standards of review

Whether redevelopment must be preceded by amendment of the redevelopment plan is an issue to be resolved by the district judge before trial.[4] We will defer to the district judge's factual findings and conduct a de novo review of his or her legal conclusions.[5]

When a redevelopment plan's involvement is apparent from the government's eminent domain complaint, a landowner's failure to raise in a responsive pleading the issue of the need for plan amendment may constitute waiver. Likewise, when the eminent

---

[3]*See State, Dep't of Mtr. Vehicles v. Rowland*, 107 Nev. 475, 479, 814 P.2d 80, 83 (1991); *SIIS v. Buckley*, 100 Nev. 376, 382, 682 P.2d 1387, 1390 (1984).

[4]*See* 27 Am. Jur. 2d *Eminent Domain* § 617 (1996) (stating that the court in an eminent domain case has the duty to determine "all issues other than the precise issue of the amount of compensation to be awarded"); *cf. State ex rel. Dep't Hwys. v. Linnecke*, 86 Nev. 257, 260, 468 P.2d 8, 10 (1970) (stating that it is a question of law whether a landowner's access to his or her property has been substantially impaired by a governmental taking); *Goldfield Con. v. O. S. A. Co.*, 38 Nev. 426, 447, 150 P. 313, 319 (1915) (stating that the determination of the right of condemnation and matters incidental to that determination are "solely for the court").

[5]*See MTBD v. Handlery Hotel, Inc.*, 86 Cal. Rptr. 2d 473, 481 (Ct. App. 1999); *Fowler Trust v. City of Boulder*, 17 P.3d 797, 802 (Colo. 2001).

domain complaint involves land within an area covered by a redevelopment plan and the complaint is accompanied or followed by a motion for occupancy, failure to raise the issue of the need for plan amendment in opposition to the motion may also constitute waiver.

Here, we note that the Moldons did not initially oppose the motion for occupancy. But the Agency has made no showing that the Moldons' tardy opposition worked to the Agency's detriment.[6] Thus, we cannot conclude that the Moldons waived their argument that amendment of the Redevelopment Plan must precede condemnation.

*Standards for amendment of a redevelopment plan*

Absent from Nevada's Community Redevelopment Law is a clear directive as to the quality and quantity of redevelopment necessary to require a redevelopment plan's amendment. As enacted in 1959, subsection (1) of NRS 279.608 merely read:

> If at any time after the adoption of a tentative or redevelopment plan for a project area by the legislative body, it becomes necessary or desirable to amend or modify such plan, the legislative body may amend such plan upon the recommendation of the agency.[7]

This statutory provision was derived verbatim from former California Health and Safety Code section 33747.[8]

In 1983, the Nevada Legislature amended NRS 279.608(1) by changing "such" to "the," and by adding a second sentence: "An amendment or modification may include without limitation the addition of one or more areas to any redevelopment project which are adjacent to the project area and which benefit from the project."[9] This added sentence was modeled after California's amendment to its Health and Safety Code section 33450 (formerly, section 33747).[10] Our Legislature's addition of the sentence seems

[6]*See Merrill v. DeMott,* 113 Nev. 1390, 1400, 951 P.2d 1040, 1046 (1997) (stating that waiver involves the intentional relinquishment of a known right); *Max 327, Inc. v. City of Portland,* 838 P.2d 631, 633 (Or. Ct. App. 1992) ("A waiver can be retracted at any time before the other party has materially changed position in reliance thereon.").

[7]1959 Nev. Stat., ch. 418, § 117, at 664.

[8]*Compare id., with* 1955 Cal. Stat., ch. 1761, § 4, at 3251. The remaining subsections of NRS 279.608, governing the procedures for amendment, were also taken from former California Health and Safety Code section 33747.

[9]1983 Nev. Stat., ch. 211, § 1, at 492.

[10]*Compare id., with* 1967 Cal. Stat., ch. 1242, § 8.5, at 3016, *and* 1972 Cal. Stat., ch. 511, § 1, at 890.

to have been prompted by the City of Reno's efforts to implement and expand its "proposed downtown and river improvement plan."[11]

In 1985, our Legislature again embraced a California amendment to its Health and Safety Code, to help shape NRS 279.608(1) into its current form. Excised from the statute was the "tentative or" language; but the Nevada Legislature went even further than its California counterpart, and also excised the "for a project area" language:

> If at any time after the adoption of a redevelopment plan by the legislative body, it becomes necessary or desirable to amend or modify the plan, the legislative body may amend the plan upon the recommendation of the agency. An amendment or modification may include the addition of one or more areas to any redevelopment area.[12]

According to documents generated during the 63rd Legislative Session, the "for a project area" language was eliminated simply because the "distinction [between a redevelopment area and a project area] serves no useful purpose."[13]

Because NRS 279.608(1) does not clearly establish a standard for determining when amendment must occur, we may look for guidance to California's judicial interpretations of its analogous statute.[14] Further, we may presume that the Nevada Legislature

---

[11]Hearing on S.B. 229 Before the Senate Comm. on Government Affairs, 62d Leg., Ex. F (Nev., March 30, 1983).

[12]*Compare* 1985 Nev. Stat., ch. 639, § 40, at 2077, *with* 1959 Cal. Stat., ch. 1102, § 19, at 3181 (removing "tentative or"). Last amended in 1977, California Health and Safety Code section 33450 currently reads, in relevant part:

> If at any time after the adoption of a redevelopment plan for a project area by the legislative body, it becomes necessary or desirable to amend or modify such plan, the legislative body may by ordinance amend such plan upon the recommendation of the agency. The agency recommendation to amend or modify a redevelopment plan may include a change in the boundaries of the project area to add land to or exclude land from the project area. . . .

1977 Cal. Stat., ch. 797, § 11, at 2446.

[13]Hearing on S.B. 474 Before the Senate Comm. on Government Affairs, 63d Leg., Ex. E (Nev., May 20, 1985).

[14]*See Moody v. Manny's Auto Repair,* 110 Nev. 320, 327, 871 P.2d 935, 940 (1994), *superceded on other grounds by statute,* and *cited with approval in Madera v. SIIS,* 114 Nev. 253, 257, 956 P.2d 117, 120 (1998) (stating that, when statutory "language is ambiguous, a court should consult other sources such as legislative history, legislative intent, and analogous statutory provisions"); 2B Norman J. Singer, *Statutes and Statutory Construction* § 52:02, at 282 (6th ed. 2000) ("When the legislature of a state adopts a statute which

intended for NRS 279.608(1) to have the construction given to California Health and Safety Code section 33450 and its predecessor by the California courts at the time NRS 279.608(1) was enacted and amended.[15] Finally, given that the district court, in interpreting NRS 279.608(1), looked to the required contents for any redevelopment plan,[16] California decisional law on that topic is also pertinent.

In *In re Bunker Hill Urban Renewal Project 1B*,[17] a 1964 decision, the California Supreme Court assessed the validity of a redevelopment plan allegedly deficient in its portrayal of proposed open spaces, limitations on buildings, and property to be devoted to public purposes.[18] The landowners asserted that the plan contained no standards to guide the discretion of the redevelopment agency.[19] The court, incidentally noting that any amendment of a redevelopment plan would take over two months, upheld the plan, recognizing that redevelopment plans must be flexible so that amendment is not required for every redevelopment contingency:

> The Legislature can be assumed to have recognized that a final plan must be enacted before the agency can commence acquisition of land and that thereafter the land must be resold

is identical or similar to one in effect in another state or country, the courts of the adopting state usually adopt the construction placed on the statute in the jurisdiction in which it originated.").

[15]*See Moody*, 110 Nev. at 327, 871 P.2d at 940; *United States v. State ex rel. Beko*, 88 Nev. 76, 82, 493 P.2d 1324, 1327 (1972); *cf. Northern Nev. Ass'n Injured Workers v. SIIS*, 107 Nev. 108, 112, 807 P.2d 728, 730 (1991) (stating that legislative amendment of other parts of a law may indicate approval of interpretations pertaining to the unchanged and unaffected parts of the law); 2B Singer, *supra* note 14, § 49:10, at 112 ("[L]egislative inaction following a contemporaneous and practical interpretation is evidence that the legislature intends to adopt such an interpretation.").

[16]Derived from former California Health and Safety Code section 33707, NRS 279.572 states that a redevelopment plan "must show":

1. The amount of open space to be provided and the layout of streets;

2. Limitations on type, size, height, number and proposed use of buildings;

3. The approximate number of dwelling units;

4. The property to be devoted to public purposes and the nature of those purposes;

5. Other covenants, conditions and restrictions which the legislative body prescribes; and

6. The proposed method of financing the redevelopment plan . . . .

[17]389 P.2d 538 (Cal. 1964).

[18]*Id.* at 557.

[19]*Id.* at 557-58.

to redevelopers for actual construction so that some appreciable interval of time must elapse between the evolution and formulation of the final plan by the agency, its adoption by the legislative body and its ultimate fulfillment by redevelopers. Obviously, some flexibility in the final plan so far as it [shows open spaces, limitations on buildings, and property to be devoted to public purposes] is essential *to avoid the necessity of constantly seeking amendment by the legislative body each time that some unforeseeable exigency arises. . . .*

It cannot be seriously argued that a final plan must be a compilation of blueprints or working drawings, representing final engineering studies, primarily because the agency is not the one who does the building. The final plan is not required to be precise from an engineering standpoint but only as reasonably precise and detailed from a planning standpoint as may be expected in light of the complexity and diversity of the conditions which will be encountered.[20]

The theme that a redevelopment agency is to be spared the burden of constantly amending a redevelopment plan was further fleshed out in a 1985 California Court of Appeal decision, *Paris v. Community Redevelopment Agency.*[21] There, Paris sought to remodel a portion of his building into a movie theater.[22] Because the building was located within a redevelopment area managed by the City of Pico-Rivera's Community Redevelopment Agency (''CRA''), Paris' proposal was submitted to CRA's director for review.[23] The director found that the proposal did not conform to the 1974 redevelopment plan's definition of a commercial use, and that the proposal conflicted with a 1983 CRA resolution specifically prohibiting movie theaters in the area of Paris' building.[24] Consequently, Paris' proposal was denied.[25]

On appeal from a trial court's refusal to compel the issuance of a building permit for his proposed movie theater, Paris argued that CRA's resolution was invalid ''because it was, in effect, an amendment of the redevelopment plan which did not comply with formal requirements for amending the plan.''[26] The California Court of Appeal disagreed, concluding that the resolution was not intended as an amendment of the redevelopment plan, and that

---

[20]*Id.* at 559 (citation and quotation omitted) (emphasis added).

[21]213 Cal. Rptr. 432 (Ct. App. 1985).

[22]*Id.* at 435.

[23]*Id.*

[24]*Id.*

[25]*Id.* at 436.

[26]*Id.*

"[n]ecessarily some of the statements in a redevelopment plan will be general and tentative, and formal amendment of the plan is not required for a subsequent administrative interpretation and filling in of details."[27]

Both *Bunker Hill* and *Paris* were decided before the NRS 279.608(1) amendment process was completed, and therefore provide insight into the statute's intended meaning. But the district court alluded to neither case in its dismissal orders. Instead, the district court formulated a "materiality" test based on the combined effect of (1) NRS 279.572's language that a redevelopment plan "must show" open spaces, street layouts, building limitations, etc.; and (2) some unidentified requirement that redevelopment plans be specific at the time public hearings are first conducted. In regard to the first factor, the district court construed the statutory language "must show" as imposing a specificity requirement on street layouts, open spaces, etc. But neither the Moldons nor the Crocketts and APFS have provided any authority that "must show" means, as the district court proposed, "must be specific." NRS 279.572 is silent regarding the degree to which open spaces and street layouts, etc., must be shown. Thus, while we are receptive to a materiality test for determining the necessity of amendment under NRS 279.608(1), we are not persuaded that its focus should be fixed by an unsupported construction of NRS 279.572.

A redevelopment agency should not be saddled with the burden of amending a redevelopment plan to include every new redevelopment project or change to a redevelopment project, without regard to the nature of the project or the change. At the very least, inappreciable or intangible new redevelopment projects or changes to existing projects should not require amendment of a redevelopment plan. On the other hand, redevelopment outside the bounds of the applicable redevelopment plan, without public input through the amendment process, would be intolerable.[28] We conclude that the acceptable middle ground between these two extremes lies in a "materiality" test, read in conjunction with the *Paris* rule, that "formal amendment of [a redevelopment] plan is not required for a subsequent administrative interpretation and filling in of details."[29]

Thus, under the standard we adopt today, formal amendment of

---

[27]*Id.*

[28]*See, e.g., Monarch Chem. Works v. City of Omaha,* 277 N.W.2d 423 (Neb. 1979) (affirming issuance of an injunction prohibiting the city from condemning a landowner's property for use as a penal complex because that use was not contemplated by the applicable redevelopment plan).

[29]*Paris,* 213 Cal. Rptr. at 436.

a redevelopment plan would be mandated for material deviations from or changes to a redevelopment plan; but formal amendment would be unnecessary for an administrative interpretation of the plan or a filling in of details. Combining a ''materiality'' test with the *Paris* rule provides a comprehensive standard by which to measure the necessity of amendment.

We stress, however, that the filling-in of redevelopment ''details'' outside of the amendment process is limited by the language of the redevelopment plan. Fundamentally, redevelopment that is consistent with the redevelopment plan's express language or a liberal construction of that language does not require plan amendment because there is no deviation from or change to the plan's contours.

As we earlier alluded, a district court's materiality determination will ordinarily be a question of law, involving a comparison of the proposed redevelopment action to the existing redevelopment plan. But we do not rule out the possibility that the determination will present legal or factual questions, warranting a pre-trial, evidentiary hearing.

The standard we have announced should enable a redevelopment agency to retain the flexibility and resources necessary to accomplish its legislated goal of eliminating urban blight, and is consistent with the Legislature's statements that (1) blighted areas ''constitute[ ] a serious and growing menace'' which is ''injurious and inimical to the public health, safety and welfare of the people of the communities in which they exist and of the people of the state'';[30] (2) ''[t]his menace is becoming increasingly direct and substantial in its significance and effect'';[31] and (3) ''[t]he benefits which will result from . . . the redevelopment of blighted areas will accrue to all the inhabitants and property owners of the communities in which they exist.''[32]

Certainly not unfounded is the district court's concern that an overly general redevelopment plan might give way to unchecked agency approval of *any* redevelopment project without public input through the amendment process. But such a redevelopment plan is subject to legislative review[33] and to public input and challenge

[30]NRS 279.418(1).

[31]NRS 279.418(4).

[32]NRS 279.418(5). The policy rationale underlying Nevada's Community Redevelopment Law may be used as an interpretive aid to determine when amendments must be made. *See Attorney General v. Board of Regents,* 114 Nev. 388, 393, 956 P.2d 770, 774 (1998).

[33]*See* NRS 279.586 (establishing eight criteria for a legislative body to

before its adoption.[34] Thus, arguments regarding the generality of a redevelopment plan can be adequately addressed during the redevelopment plan approval process, and up to "90 days after the date of adoption of the ordinance adopting or amending the plan."[35] And triggering the amendment process for material deviations from or changes to a redevelopment plan should ensure that a clearly identifiable link remains between the plan and a subsequently proposed redevelopment project or a change to an existing redevelopment project.

In creating and applying this standard, we note that the United States Supreme Court long ago approved the use of eminent domain to accomplish redevelopment.[36] We are particularly cognizant of the High Court's pronouncement that "[o]nce the question of the public purpose has been decided, the amount and character of land to be taken for the [redevelopment] project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch."[37] Thus, in considering whether a redevelopment plan must be amended, the judiciary's role is limited.

### Amendment of the instant Redevelopment Plan is unnecessary

As an initial matter, the district court misconstrued the OPA by stating that the OPA "contemplates the vacation of four public streets *and a public park from the land which Stratosphere . . . would acquire.*" Rather, the OPA requires Stratosphere to relocate the park from one part of the project area to another, onto Stratosphere property and property to be acquired by and for the Agency. Stratosphere was to then convey, without remuneration, its share of that property to the Agency.

With the OPA thus understood, we are convinced that NRS 279.608(1) does not require amendment of the Redevelopment Plan to show the vacation of portions of four streets and the relocation of a park. Although the OPA certainly contemplates redevelopment beyond four streets and a park,[38] the district court did

---

assess in deciding whether to adopt a redevelopment plan); NRS 279.598 (prohibiting the approval of any plan "unless it contains adequate safeguards that the work of redevelopment will be carried out pursuant to the plan").

[34]*See* NRS 279.580(1) (providing that "[t]he legislative body shall consider the redevelopment plan submitted by the agency and all evidence and testimony for or against the adoption of the plan at a public hearing").

[35]NRS 279.609 (providing for legal action to question the validity of a redevelopment plan).

[36]*See Berman v. Parker,* 348 U.S. 26 (1954).

[37]*Id.* at 35-36.

[38]*See supra* text preceding and accompanying note 2.

not go further in ordering dismissal. We likewise limit our review of Stratosphere's project.

Here, the vacation of the four streets and the relocation of the park do not constitute a material deviation from or change to the plan. Provision for each of these actions was explicitly and comprehensively made in the Redevelopment Plan. All that remained to be filled in were the details of location.

*Old Omaha Ass'n v. City of Omaha*[39] provides support. Nebraska's Community Development Law provides that " '[a] redevelopment plan may be modified at any time,' " but if modified after the lease or sale of real property in the redevelopment project area, a redeveloper of that property who is affected by the proposed modification must consent to the modification.[40] Old Omaha Association (the "Association") entered into a redevelopment agreement with the City of Omaha to construct and operate a parking facility on a parcel of real property in the redevelopment area.[41] Twelve years later, the City of Omaha began eminent domain proceedings to acquire the site occupied by the Association's surface parking lot for the construction of a six-level parking garage with retail or commercial space on the first level.[42]

On appeal from the trial court's denial of injunctive relief to stop the condemnation proceedings, the Association argued that the change from a surface parking lot to a multilevel parking garage with retail facilities was a modification of the redevelopment plan requiring the Association's consent.[43] The appellate court disagreed, reasoning that the redevelopment plan generally contemplated (1) that future land uses would include "commercial or office usage on the ground floor" of a "typical" structure, and "adequate areas for automobile storage, both within individual buildings and throughout the area"; and (2) that vehicle "circulation problem[s]" in the area could be remedied by the "development of adequate off-street parking facilities."[44] The fact that the redevelopment plan "painted with a broad brush" did not persuade the court that the changes sought by the City of Omaha modified the plan.[45]

The Redevelopment Plan at issue here is equal in foresight to,

[39] 513 N.W.2d 329 (Neb. Ct. App. 1994).

[40] *Id.* at 337 (quoting Neb. Rev. Stat. § 18-2117).

[41] *Id.* at 331.

[42] *Id.* at 332, 336, 338.

[43] *Id.* at 332, 337.

[44] *Id.* at 337 (emphasis omitted).

[45] *Id.* at 337, 338.

and paints no more broadly than, the redevelopment plan in *Old Omaha Ass'n*. For instance, the Redevelopment Plan provides that the Agency may "establish . . . traffic circulation, traffic access and other development and design controls necessary for proper development of both private and public areas within the Redevelopment Area." The City of Las Vegas is required to aid the Agency in this regard by "opening, closing, vacating, widening or changing the grades of streets, alleys and other public rights-of-way . . . in the Redevelopment Area." Further, the Redevelopment Plan states that the Agency may "install and construct or . . . cause to be installed and constructed . . . parks," and that "[a]ny public agency, with or without consideration, may . . . [c]ause parks . . . to be furnished adjacent to or in connection with redevelopment projects." To accomplish these tasks, "[t]he Agency is authorized to demolish or cause to be demolished buildings, structures, or other improvements from any real property in the Redevelopment Area owned by the Agency as necessary to carry out the objectives of th[e] Plan." The vacation of portions of the four streets and the relocation of the park at issue here fall well within these clear parameters.

Finally, the Agency has concluded that Stratosphere's project does not require amendment of the Redevelopment Plan. " 'The construction placed on a statute by the agency charged with the duty of administering it is entitled to deference.' "[46] "The persuasive force of such an interpretation is strengthened when the legislature, by its failure to amend a statute, 'silently acquiesces' in the administrative interpretation."[47] The Agency has been involved in eleven redevelopment projects without invoking NRS 279.608(1), since the Redevelopment Plan's 1986 approval. Although the record is silent as to the scope and precise dates of these other projects, legislative acquiescence in the avoidance of NRS 279.608(1) can be inferred from the fact that the statute has not been amended since before the Redevelopment Plan's approval.

## CONCLUSION

The district court erred in dismissing the Agency's eminent domain complaints. Contrary to the district court's ruling, the limited redevelopment at issue here does not require amendment of the Redevelopment Plan. We reverse the district court's orders and remand for further condemnation proceedings.[48]

---

[46]*SIIS v. Miller,* 112 Nev. 1112, 1118, 923 P.2d 577, 581 (1996) (quoting *SIIS v. Snyder,* 109 Nev. 1223, 1228, 865 P.2d 1168, 1171 (1993)).

[47]*State v. Schoettler,* 274 P.2d 852, 855 (Wash. 1954); *accord Board of Regents,* 114 Nev. at 396, 956 P.2d at 776.

[48]In so doing, we make no ruling on the validity of respondents' arguments

MAUPIN, C. J., dissenting:

I cannot conclude that the district court erred in ruling that the vacation of streets and the relocation of a public park required formal amendment of the Redevelopment Plan for the Downtown Las Vegas Redevelopment Area.

The majority holds that formal amendment to a redevelopment plan is (1) mandated only for material deviations from, or changes to, a redevelopment plan; and (2) material changes to a plan do not include subsequent "administrative interpretation and filling in of details." While I agree that a material change in a redevelopment plan stimulates the formal amendment process, I believe that certain aspects of the redevelopment project approved by the City of Las Vegas Downtown Redevelopment Agency implicate the amendment process. I am also concerned that the majority's view of the agency's discretion to effect "administrative interpretation" paints its authority with too broad a brush.

## DISCUSSION

NRS 279.608(1) permits cities and counties to amend or modify redevelopment plans upon the recommendation of the redevelopment agency. As noted by the majority, this statute does not clearly establish a standard setting forth the events that stimulate the formal amendment process. However, NRS 279.572 requires, *inter alia,* that redevelopment plans show the amount of open space to be provided, the layout of streets, the property to be devoted to public purposes and the nature of those purposes. Facially, without a legislative statement of the requirements that trigger the formal plan amendment process, it would seem that vacation of streets and the relocation of a park depicted on the approved plan map would constitute a material change in the plan.

The majority relies upon three case decisions in support of its ruling today: *In re Bunker Hill Urban Renewal Project 1B,*[1] *Paris v. Community Redevelopment Agency*[2] and *Old Omaha Ass'n v. City of Omaha.*[3] The court in *Bunker Hill* observed:

> [S]ome flexibility in the final plan so far as it [shows open spaces, limitations on buildings, and property to be devoted to public purposes] is essential to avoid the necessity of con-

that were presented to, but not considered or expressly resolved by, the district court. Nor do we consider the Moldons' argument in their June 1, 2001 motion to dismiss appeal, that their property is not being taken for a public use. That motion is denied; the public use argument is properly raised in the district court.

[1]389 P.2d 538 (Cal. 1964).

[2]213 Cal. Rptr. 432 (Ct. App. 1985).

[3]513 N.W.2d 329 (Neb. Ct. App. 1994).

stantly seeking amendment by the legislative body each time that some unforeseeable exigency arises. . . .

It cannot be seriously argued that the final plan must be a compilation of blueprints or working drawings, representing final engineering studies, primarily because the agency is not the one who does the building. The final plan is not required to be precise from an engineering standpoint but only as reasonably precise and detailed from a planning standpoint as may be expected in light of "the complexity and diversity of the conditions which will be encountered."[4]

The *Bunker Hill* court noted that the amendment process would take over two months, and our majority now embraces a "theme" in the California cases that would "spare" redevelopment agencies from the "burden" of constantly amending redevelopment plans. I disagree with this "theme" approach. First, important due process rights are implicated because effectuation of a redevelopment plan involves the power of eminent domain. Second, two months is not an unreasonable burden on a public agency to protect important private property rights. Third, the vacation of streets and relocation of parks are not "details" intrinsic to an individual component of a redevelopment process. Fourth, the vacation of streets and the relocation of public parks are not events that occur "constantly."

In *Paris,* the redevelopment agency refused an application to partially convert an existing building to include a movie theater facility. The agency determined that the proposed use conflicted with a resolution prohibiting movie theaters within a certain area. The California Court of Appeal rejected the landowner's contention that the resolution effectively amended the redevelopment plan without the required formalities. In my view, the resolution at issue in *Paris* was more akin to a zoning decision, not a full-blown amendment to the redevelopment plan itself. In *Old Omaha,* the Nebraska Court of Appeals determined that a change in use from a previously approved single-story, parking garage to a multi-story garage did not implicate the formal amendment process. Both *Paris* and *Old Omaha* involve details concerning the use of existing parcels within an improvement district. The decisions and resolutions of the agencies in those cases would not require formal amendment to a redevelopment plan adopted pursuant to the Nevada statutory framework.[5]

---

[4] 389 P.2d at 559 (citations omitted).

[5] It should be noted that the Nevada redevelopment statutes require that plans of redevelopment show limitations on type, size, height, number and proposed use of buildings. NRS 279.572(2). Under *Paris,* decisions concerning changes in such uses would amount to changes that might, but would not necessarily, require initiation of an amendment process.

Here, however, the approved plan, in addition to giving the Redevelopment Agency authority to exercise eminent domain powers, requires the city to assist the Agency in implementing the plan by "opening, closing, vacating, widening or changing grades of streets, alleys and other public rights-of-way." The plan further allows the Agency to establish "traffic circulation, traffic access and other development and design controls necessary for proper development of both private and public areas within the Redevelopment Area." Finally, the plan provides that the Agency may cause parks to be constructed within the redevelopment district. These are very broad powers, some of which I conclude go beyond the scope of the authority created by the Legislature.

The ability to amend under NRS 279.608 is quite specific in terms of the procedure to be followed. However, there are no stated criteria in this statute governing when the amendment process is required, other than the statement in subsection (3) that "substantial" changes must be submitted in a written recommendation for consideration by a city or county government to amend the plan. Thus, I believe NRS 279.608 and NRS 279.572 must be read together to determine legislative intent. As noted, NRS 279.572 requires that redevelopment plans show open spaces, layout of streets, size, height, number and proposed use of buildings, number of dwelling units, property to be devoted to public purposes, other covenants, conditions and restrictions, etc. While changes in the use of individual dwelling units and building sizes may involve mere details not requiring resort to the formal amendment process, vacation of streets and relocation of public parks depicted on the approved map are entirely different matters. Certainly, vacation of streets and relocation of parks are not "details" falling within the parameters of at least two of the case decisions upon which the majority relies. I therefore cannot conclude that the Nevada Legislature, acting in the best interests of the people of this state, intended to vest the Redevelopment Agency with such powers without going through a publicly noticed amendment process.

As indicated by the majority, affidavits of the executive directors of the California Redevelopment Association and the City of Reno Redevelopment Agency were made part of the record in the proceedings before the district court. That testimony discusses the need to keep redevelopment plans general to promote flexibility, quick response to changing conditions, and to avoid the need to initiate formal amendment procedures in connection with each new proposal for private development. Generality of such plans, according to these witnesses, enables a redevelopment agency to avoid the unnecessary depletion of agency resources that would result if every transaction required the scrutiny of a formal amend-

ment process. In my view, these considerations are not at play in this case. First, the vacation of streets and relocation of public parks are not measures that interfere with the flexibility to quickly react to private development opportunities within a redevelopment district. Second, as noted, the formal amendment process is not necessarily required in every instance where the agency makes arrangements with individual developers or other persons and entities involved in redevelopment issues.

## CONCLUSION

Because redevelopment plans involve the drastic step of taking or "condemning" private property for ultimate partial or full reconveyance to private enterprise, the scope of a redevelopment agency's discretion is critical to the protection of the due process rights of property owners that find themselves within a redevelopment district. I would hold that a plan, which provides for vacation of streets and relocation of public parks depicted on an approved plan map without stimulating the formal amendment process, gives the agency discretion beyond that conferred upon it by the Nevada Legislature.

Thus, I believe the district court correctly ruled that the proposed project in this instance materially changed the plan and, accordingly, implicated the formal amendment process.