CITY OF LAS VEGAS DOWNTOWN REDEVELOPMENT AGENCY; FREMONT STREET EXPERIENCE LIMITED LIABILITY COMPANY, AND FREMONT STREET EXPERIENCE PARKING CORP., APPELLANTS/CROSS-RESPONDENTS, *v.* CAROL PAPPAS; JOHN H. PAPPAS, JR.; AND HARRY J. PAPPAS, RESPONDENTS/CROSS-APPELLANTS.

No. 39255

September 8, 2003                                              76 P.3d 1

*Beckley Singleton, Chtd.,* and *Rex A. Jemison* and *Daniel F. Polsenberg,* Las Vegas; *Bradford R. Jerbic,* City Attorney, *William P. Henry,* Senior Litigation Counsel, and *Philip R. Byrnes Jr.,* Deputy City Attorney, Las Vegas, for Appellant/Cross-Respondent City of Las Vegas Downtown Redevelopment Agency.

*Lionel Sawyer & Collins* and *Samuel S. Lionel,* Las Vegas, for Appellants/Cross-Respondents Fremont Street Experience and Fremont Street Experience Parking Corp.

*A. Grant Gerber & Associates* and *A. Grant Gerber,* Elko; *Glade L. Hall,* Reno, for Respondents/Cross-Appellants.

*Kolesar & Leatham, Chtd.,* and *James B. MacRobbie,* Las Vegas; *Institute for Justice* and *Dana Berliner,* Washington, D.C., for Amicus Curiae Institute for Justice.

*Wilson & Barrows* and *Stewart R. Wilson,* Elko; *Pacific Legal Foundation* and *James S. Burling* and *Harold E. Johnson,* Sacramento, California, for Amicus Curiae Pacific Legal Foundation.

Before the Court EN BANC.[1]

## OPINION

By the Court, BECKER, J.:

This is an appeal from a district court order granting respondents' motion to dismiss in an eminent domain action and a cross-appeal from a district court order dismissing respondents' counterclaims in the same action.[2] Appellants/cross-respondents, the City of Las Vegas Downtown Redevelopment Agency (Agency), Fremont Street Experience Limited Liability Company, and Fremont Street Experience Parking Corp. (collectively Fremont Street Experience), argue the district court erred in entering an order dismissing the Agency's eminent domain complaint. Respondents/cross-appellants Carol Pappas, John H. Pappas, Jr., and Harry J. Pappas (collectively the Pappases) contend that the district court erred in entering an order dismissing their counterclaims. We conclude the district court erred in dismissing the eminent domain complaint and those portions of the counterclaims that seek damages for alleged pre-condemnation interference with the Pappases' tenants. We further conclude that the district court did not err in dismissing the remaining counterclaims.

Both the United States and Nevada Constitutions allow the taking of private property for public use provided just compensation is paid to the private property owner.[3] The Nevada Legislature has clearly defined economic redevelopment as a public purpose.[4] And, the United States Supreme Court has concluded that when a legislative body decides that a need for redevelopment serves the public, its decision is "well-nigh conclusive."[5] There is no exception to the rule "because the power of eminent domain is involved."[6] When substantial evidence supports an agency's determination that a specific project furthers economic redevelopment under NRS Chapter 279, the project is for a public purpose. The

---

[1]THE HONORABLE MARK GIBBONS, Justice, voluntarily recused himself from participation in the decision of this matter.

[2]Judge Chairez dismissed the eminent domain action; Judge Huffaker and Judge Mark Denton dismissed the counterclaims.

[3]*See* U.S. Const. amend. V; Nev. Const. art. 1, § 8, cl. 6.

[4]NRS 37.010(17).

[5]*Berman v. Parker,* 348 U.S. 26, 32 (1954).

[6]*Id.*

sole remaining issue for a jury to determine is just compensation. We conclude that in this case, substantial evidence supports the Agency's determination that the project in issue facilitates redevelopment. Thus, we conclude that the Agency's use of eminent domain was constitutionally permissible and the district court therefore erred in dismissing the Agency's eminent domain complaint.

## FACTS

On November 6, 1985, the Las Vegas City Council (Council) created the Agency to tackle redevelopment issues under NRS Chapter 279.[7] The Agency's board is comprised solely of Council members.

NRS Chapter 279 identifies redevelopment to eliminate blight as a public purpose. The Council identified various sections of the city, including the area commonly known as downtown Las Vegas, for the Agency to evaluate and determine whether redevelopment was necessary to combat physical, social, or economic blight. The downtown section identified included property owned by the Pappases. The Agency directed its staff and the City's Planning Commission to evaluate the identified area and prepare a report on any conditions showing physical, social, and economic blight in the area. The ensuing report identified various physical, economic, and social conditions within the area constituting "blight" within the definition set forth in NRS 279.388.[8] These conditions included in-

---

[7]NRS 279.428 states, "An agency shall not transact any business or exercise any powers under NRS 279.382 to 279.685, inclusive, unless, by resolution, the legislative body declares that there is need for an agency to function in the community."

[8]NRS 279.388 provides:

"Blighted area" means an area which is characterized by one or more of the following factors:

1. The existence of buildings and structures, used or intended to be used for residential, commercial, industrial or other purposes, or any combination thereof, which are unfit or unsafe for those purposes and are conducive to ill health, transmission of disease, infant mortality, juvenile delinquency or crime because of one or more of the following factors:

(a) Defective design and character of physical construction.

(b) Faulty arrangement of the interior and spacing of buildings.

(c) Overcrowding.

(d) Inadequate provision for ventilation, light, sanitation, open spaces and recreational facilities.

(e) Age, obsolescence, deterioration, dilapidation, mixed character or shifting of uses.

2. An economic dislocation, deterioration or disuse, resulting from faulty planning.

3. The subdividing and sale of lots of irregular form and shape and inadequate size for proper usefulness and development.

4. The laying out of lots in disregard of the contours and other physical characteristics of the ground and surrounding conditions.

creased crime rates and requests for police assistance, business flight from the downtown area, decline in tourism, lack of parking, visitor and residents' perceptions of lack of safety in the area, and increases in vacant and aging buildings.

Based upon this evidence, the Planning Commission submitted a redevelopment plan (Plan) to the Agency. The Agency accepted the proposed Plan, reviewed the information submitted to the Planning Commission, and decided to consider adopting the Plan. Pursuant to statute, the Agency then provided notice of a public hearing to landowners affected by the proposed Plan. At the hearing, members of the public acknowledged that significant problems existed in the downtown area. Some individuals disagreed, however, with the adoption of a redevelopment plan. Instead, they urged the Agency to work with individual landowners and businesses, and to provide money for renovations, promotions, and other methods for cleaning up and bringing people back to the downtown area.

After considering the public comments, the Agency approved the Plan. The Agency determined that blight was causing a serious physical, social, and economic burden on the City in all applicable downtown areas. The Agency concluded that working with individuals on a piecemeal basis would not stem the decline of the downtown area. The Agency also concluded that neither the City, nor the private sector, acting alone, had the resources to accomplish the redevelopment goal. The Agency found that only the combined redevelopment efforts of the City and the private sector would improve the area.

The Plan provided a framework for all future redevelopment. It was intentionally general; it included no specific projects. The purpose, however, was to eliminate physical, social, and economic blight and to encourage businesses and individuals to return to a safe downtown area with adequate parking and facilities. The Plan provided business and property owners in the area an opportunity to propose and participate in projects that would eliminate physi-

---

5. The existence of inadequate streets, open spaces and utilities.

6. The existence of lots or other areas which may be submerged.

7. Prevalence of depreciated values, impaired investments and social and economic maladjustment to such an extent that the capacity to pay taxes is reduced and tax receipts are inadequate for the cost of public services rendered.

8. A growing or total lack of proper utilization of some parts of the area, resulting in a stagnant and unproductive condition of land which is potentially useful and valuable for contributing to the public health, safety and welfare.

9. A loss of population and a reduction of proper use of some parts of the area, resulting in its further deterioration and added costs to the taxpayer for the creation of new public facilities and services elsewhere.

The Legislature adopted this provision in 1959. *See* 1959 Nev. Stat., ch. 418, § 7, at 648-49. It has been amended only once, in 1985. *See* 1985 Nev. Stat., ch. 639, § 11, at 2068-69.

cal, social, and economic blight as well as mechanisms for encouraging investors to develop new projects in the area. The Agency could also use its power of eminent domain to acquire private property for projects designed to eliminate social and economic blight.

Neither the Pappases nor any other person challenged the Plan within the ninety-day period following its adoption, as required by statute.[9] The Plan created a conclusive presumption that the area encompassing the Pappases' property was blighted under the Community Redevelopment Law.[10]

Several years passed between the adoption of the Plan and the events that led to the present action. Over that period, the Agency approved several projects. Some succeeded and some did not. The downtown area continued to lose ground. Finally, to accomplish redevelopment and eliminate physical, social, and economic blight in the core downtown area, the Agency considered various proposals for an anchor project. The Agency sought a concept that would be a feature attraction in downtown Las Vegas. The ideal project would create a safer, cleaner environment designed to draw visitors and businesses back to the downtown area. This increase in activity would then encourage additional businesses to relocate to areas outside of, but adjacent to the core. As businesses returned, improvement of residential areas would follow. Thus, in conjunction with the feature attraction, the City also considered creating new business or shopping venues in the area.

Eventually, the concept known as the Fremont Street Experience surfaced as the anchor project to accomplish the Agency's redevelopment goals. Several components comprised the Fremont Street Experience, including a sculpted steel mesh canopy stretching across Fremont Street from Main to Fourth Streets. The canopy would allow light and air flow during daylight hours but would provide shade for tourists. At night, however, the Fremont Street Experience would present a sound and light show. In addition, the Fremont Street Experience would create a pedestrian plaza by closing Fremont Street to vehicular traffic from Main Street to Las Vegas Boulevard. Finally, because of a lack of adequate public parking, plans for the Fremont Street Experience included a five-story public parking structure with some retail and office space.

Because the Agency lacked the financial resources to construct the project alone, it entered into an agreement with a consortium of downtown casinos. The consortium would finance and cover any operating losses of the feature attraction as well as the construction of the parking garage. The City would authorize the creation of the

---

[9]NRS 279.609 states in part, ''Any action questioning the validity of . . . [t]he adoption or approval of that plan . . . may only be brought after the adoption of the plan . . . or within 90 days after the date of adoption of the ordinance adopting . . . the plan.''

[10]*See* NRS 279.589.

pedestrian mall, and the Agency would provide funds to acquire the land needed to construct the garage. In return for the risk taken by the consortium in absorbing all of the construction costs, start-up losses, and possible operating losses, the consortium would control the operation and revenues of the garage as well as the operation of the feature attraction. The Council approved the Fremont Street Experience project in Bill No. 93-55.

Under the project's plans, the parking garage would occupy an entire city block. The chosen block was composed of thirty-two individual parcels in multiple ownerships. The Pappases owned three of these parcels, composing a small portion of the block. The Agency sent the Pappases an offer to purchase their property. The Pappases refused but indicated their willingness to enter into a ground lease with the Agency. Although the Agency initially indicated its willingness to enter into a ground lease, it determined that a ground lease was not feasible, as financing for the garage would not permit such an arrangement. The Agency therefore rejected this proposal and adopted a resolution to acquire the Pappases' land, if necessary, by eminent domain.

After further negotiations to purchase failed, on November 19, 1993, the Agency filed the eminent domain complaint to acquire the Pappases' property. The Agency moved for immediate occupancy pending entry of judgment. The Pappases failed to oppose the motion, which the district court granted. The Agency gained possession of the Pappases' land effective January 15, 1994.

The Pappases filed an answer and counterclaim, alleging six causes of action: (1) the Agency violated the Pappases' procedural due process rights in its initial motion for occupancy, (2) the Agency improperly took the Pappases' property through inverse condemnation by its initial motion for occupancy, (3) the Agency encouraged the Pappases' tenants to vacate and not pay rent because of the impending condemnation, (4) the Agency engaged in intentional interference with business opportunities, (5) the Agency violated the Pappases' substantive due process rights by failing to adequately compensate them for the taking, and (6) the Agency failed to allow the Pappases to participate in the redevelopment project as statutorily required.

The Pappases then filed a motion for rehearing regarding the Agency's immediate occupancy. The district court denied the motion. The Agency took possession of the property, began demolishing the existing building, and commenced construction of the parking garage.[11]

---

[11]We note that the appropriate vehicle for challenging an order granting a motion for immediate occupancy is a petition for writ relief, as an appeal of this interlocutory order is unavailable under NRAP 3A(b).

Thereafter, the Agency filed a summary judgment motion on all of the Pappases' counterclaims. The district court found no genuine issue of material fact as to the first five counterclaims, noting that they were subsumed within the original eminent domain complaint, and the counterclaims for monetary damages could be pursued as a part of the just compensation in the eminent domain action. The district court denied the summary judgment motion regarding the Pappases' right of participation in the redevelopment project. The Pappases appealed the dismissal of their counterclaims, but because the district court's decision was not a final judgment resolving all of the claims between the parties, this court dismissed the appeal for lack of jurisdiction.

Over three years after the district court had granted the motion for occupancy and the garage had been constructed, the Pappases filed a motion to dismiss the Agency's eminent domain complaint.[12] The Pappases alleged the following: (1) the exercise of the power of eminent domain was without legal justification because the redevelopment plan was fatally deficient, (2) the district court lacked jurisdiction because the Agency improperly invoked the power of eminent domain, (3) the Agency negotiated with the Pappases in bad faith, and (4) the Agency violated the Pappases' procedural due process rights by violating the Nevada Rules of Civil Procedure. Shortly thereafter, Fremont Street Experience moved, and was granted permission to intervene in the pending litigation.

In their motion to dismiss, the Pappases attached minutes from the City Council meetings regarding the Fremont Street Experience, the Fremont Street Experience agreement, and various other affidavits and records regarding the project. In addition, the district court ordered the Agency to prepare a record of the administrative proceedings that led to the eminent domain complaint. Thus, the motion to dismiss was converted into one for summary judgment.

After considering the evidence and conducting a hearing, the district court dismissed the Agency's complaint. The district court concluded: (1) the construction of the garage did not preclude the Pappases from contesting the project's public purpose; (2) the ninety-day statute of limitations in NRS 279.609 did not preclude judicial review of the taking; (3) the Agency lacked authority to condemn the property because it failed to amend the redevelopment plan, and the district court lacked jurisdiction to hear the Agency's eminent domain complaint; (4) the Agency lacked authority to use

---

[12]The motion was also filed shortly before a trial was to begin on the value of the Pappases' property. The appraiser for the City valued the property at approximately $500,000, while the Pappases' appraiser valued the property at $1,400,000. The Pappases disagreed with their own appraiser and believed their property was worth $7,000,000.

eminent domain because there were other less restrictive means to obtain the property; (5) the Agency acted in bad faith regarding owner participation in the project; (6) despite finding redevelopment a statutorily valid public use, the Agency's taking of the Pappases' property was not a public use because of the above statutory violations; and (7) the Agency failed to act in good faith regarding negotiations for the property. The district court eventually dismissed the one remaining counterclaim, finalizing the judgment by resolving all of the pending claims. This appeal and cross-appeal followed.

## DISCUSSION

The district court's findings in support of dismissing the eminent domain complaint encompass four primary issues: (1) whether the Pappases are procedurally barred from challenging the legality of the eminent domain proceedings based on the doctrines of estoppel or waiver, (2) whether the taking constitutes a "public use" under the Nevada and Federal Constitutions, (3) whether the Project furthers the purpose of eliminating blight under the community redevelopment statutes, and (4) whether the taking was necessary to further a public use.[13]

### Estoppel/waiver

Appellants contend that the district court erred in permitting the Pappases to challenge whether the parking structure constituted a public use and the necessity of the taking three years after the motion for occupancy was granted. Appellants argue that the Pappases should have opposed the original motion for occupancy or asserted such issues in their motion for reconsideration. Moreover, appellants allege that the Pappases should have sought an extraordinary writ in this court directing the district court to vacate its orders granting the motion for occupancy and denying the motion for reconsideration. We agree that issues regarding whether the proposed taking constitutes a "public use" under the Nevada and Federal Constitutions and whether the taking is necessary to accomplish that public purpose are issues to be addressed at the early stages of an eminent domain proceeding. Such issues need to be resolved before the existing property is substantially altered.

However, we have never held that a party seeking dismissal of an eminent domain complaint based on lack of public use or necessity

---

[13]The district court's remaining findings in support of the dismissal deal with challenges to the scope of the Plan and the need to amend the Plan whenever a particular project is undertaken. We recently rejected similar challenges in *Las Vegas Downtown Redevelopment v. Crockett,* 117 Nev. 816, 34 P.3d 553 (2001).

grounds must raise the issues in opposition to a motion for occupancy or in a motion to dismiss filed before the subject property is significantly altered. Nor have we indicated that the failure to file a petition for extraordinary relief from an order granting a motion for occupancy or denying a motion to dismiss implicates the doctrines of waiver or estoppel. Therefore, we decline to apply these doctrines to the facts of this case. However, for all eminent domain cases filed after the date of this opinion, such challenges must be raised prior to occupancy and material demolition, alteration or construction on the subject property. Failure to timely assert lack of public use or necessity will constitute a waiver of these issues.

## Public use

The United States Constitution declares that no private property shall "be taken for public use, without just compensation."[14] The Constitution of the State of Nevada similarly provides that "[p]rivate property shall not be taken for public use without just compensation having been first made."[15]

As the Illinois Court of Appeals eloquently acknowledged, "What constitutes a 'public purpose' . . . has plagued the American judiciary ever since it arrogated to itself the [prerogative] of interpreting constitutions."[16] A narrow interpretation requires actual use by the public.[17] A broad interpretation includes any " ' ' "use [that] concerns the whole community or promotes the general interest in its relation to any legitimate object of government." ' ' "[18]

When construing the Federal Constitution, the United States Supreme Court broadly interprets the term "public use" and has rejected the concept that the Constitution requires actual use of the condemned property by the public.[19] Historically, this court has also broadly interpreted "public use" to include public utility, benefit, and advantage.[20] In fact, the majority of courts that have considered this issue, under state constitutions with language similar to Nevada's, have adopted broad interpretations of "public use."[21]

---

[14]U.S. Const. amend. V.

[15]Nev. Const. art. 1, § 8, cl. 6.

[16]*Lake Louise Imp. v. Multimedia Cablevision,* 510 N.E.2d 982, 984 (Ill. App. Ct. 1987).

[17]*See Thornton Development Authority v. Upah,* 640 F. Supp. 1071, 1077 (D. Colo. 1986) (actual use like parks or streets).

[18]*Southern California Edison Co. v. Rice,* 685 F.2d 354, 356 (9th Cir. 1982) (quoting *City of Oakland v. Oakland Raiders,* 646 P.2d 835, 841 (Cal. 1982) (quoting *Bauer v. County of Ventura,* 289 P.2d 1, 6 (Cal. 1955))).

[19]*Rindge Co. v. Los Angeles,* 262 U.S. 700, 707 (1923); *Fallbrook Irrigation District v. Bradley,* 164 U.S. 112, 159-62 (1896).

[20]*Dayton Mining Co. v. Seawell,* 11 Nev. 394, 408 (1876); *see also Milchem Inc. v. District Court,* 84 Nev. 541, 548, 445 P.2d 148, 152 (1968).

[21]2A Julius L. Sackman, *Nichols on Eminent Domain* §§ 7.01[1], 7.02[3] (rev. 3d ed. 2003).

Appellants contend that the district court used too narrow an interpretation in finding that accomplishing redevelopment through the construction of the parking garage was not a public use subject to the exercise of eminent domain. The Pappases claim that the garage is not a proper public use, even under the broader definition of public use, because the garage will be owned and operated by a private entity. The Pappases assert that whenever eminent domain involves the transfer of land from one private individual to another private individual, such a transfer is not for a public purpose.

The United States Supreme Court has soundly rejected the notion that transfer of land ownership from one private individual to another automatically falls outside the power of eminent domain. In *Hawaii Housing Authority v. Midkiff*,[22] the High Court considered this issue in the context of a Hawaii statute designed to diversify land ownership in Hawaii. The Hawaii Legislature enacted the Land Reform Act of 1967 (Act) to break up a land oligopoly that had been in existence for hundreds of years.[23] To accomplish this goal, the Act allowed certain land to be condemned and then transferred from the landowner to other individuals who had previously leased the land from the landowner.[24] Under the Act, taking private property from the oligopoly of landowners and distributing the land to existing tenants was deemed to be a public purpose.[25]

The *Midkiff* Court held that "deference to the legislature's 'public use' determination is required 'until it is shown to involve an impossibility.'"[26] Continuing, the Court pointed out that it would "not substitute its judgment for a legislature's judgment as to what constitutes a public use 'unless the use be palpably without reasonable foundation.'"[27]

The Court held that controlling the oligopoly was a reasonable exercise of Hawaii's police power.[28] Although the Court recognized that the Act might not correct the problem, it concluded that "'the [constitutional requirement] is satisfied if . . . the . . . [state] Legislature rationally could have believed that the [Act] would promote its objective.'"[29] In this respect, the Court observed that

[22]467 U.S. 229 (1984).

[23]*Id.* at 232-33.

[24]*Id.* at 233.

[25]*Id.* at 233-34.

[26]*Id.* at 240 (quoting *Old Dominion Co. v. United States,* 269 U.S. 55, 66 (1925)).

[27]*Id.* at 241 (quoting *United States v. Gettysburg Electric R'Y.,* 160 U.S. 668, 680 (1896)).

[28]*Id.* at 242.

[29]*Id.* (quoting *Western & Southern L. I. Co. v. Bd. of Equalization,* 451 U.S. 648, 671-72 (1981) (alteration in original)).

the courts are not the place for "empirical debates over the wisdom of takings."[30] Accordingly, "if a legislature . . . determines there are substantial reasons for an exercise of the taking power, courts must defer to its determination that the taking will serve a public use."[31]

We have also rejected the concept that public ownership of the condemned property is essential to public use. In *Urban Renewal Agency v. Iacometti*,[32] we indicated that "[p]ossesory use by the public is not an indispensable prerequisite to the lawful exercise of the power of eminent domain."[33] We further explained that "[t]he rights of the [property owners] will be constitutionally satisfied when they receive just compensation for their properties."[34]

The Nevada Legislature, by enacting the Community Redevelopment Law, has declared that physical, social, and economic blight constitute "a serious and growing menace which is condemned as injurious and inimical to the public health, safety and welfare of the people."[35] Further, the Legislature has specifically found that blight decreases property values[36] and increases crime, which necessarily causes a disproportionate allocation of public services such as police, fire and accident protection in blighted areas.[37] The Legislature has declared that a community can exercise the power of eminent domain "whenever the redevelopment of blighted areas cannot be accomplished by private enterprise alone."[38] More importantly, NRS 279.424(3) specifically provides that "the redevelopment of blighted areas and the provision for appropriate continuing land use . . . constitute public uses and purposes . . . and are governmental functions of state concern in the interests of health, safety and welfare of the people."

Thus, so long as a redevelopment plan, or any individual redevelopment project, bears a rational relationship to the eradication of physical, social or economic blight, it serves a public purpose within the power of eminent domain. The focus of the inquiry is whether the plan or project serves the public purpose, not whether the condemned property is eventually owned by a public or private entity.

---

[30]*Id.* at 243.

[31]*Id.* at 244.

[32]79 Nev. 113, 379 P.2d 466 (1963).

[33]*Id.* at 126, 379 P.2d at 472-73.

[34]*Id.* at 127, 379 P.2d at 473.

[35]NRS 279.418(1).

[36]NRS 279.420.

[37]NRS 279.418(3).

[38]NRS 279.424(2).

In this case, there is a rational relationship that justifies the exercise of the power of eminent domain. The determination that the project would serve a public use is not " 'palpably without reasonable foundation.' "[39] To the contrary, the record indicates the Agency's purpose for entering into a redevelopment agreement with Fremont Street Experience was to construct a safe entertainment street mall to attract visitors and businesses back to the downtown area. The garage was planned to ensure that adequate off-street public parking would be available for patrons of the downtown businesses. The entire project was designed to encourage additional revitalization projects spreading out from the central core of the downtown area. Thus, the project's central focus was to combat economic, social, and physical blight, a public purpose as defined by the Legislature.

It is this feature that distinguishes the anchor attraction and garage from cases where courts have dismissed eminent domain complaints because the taking was not for a public use.[40] In those cases, the courts found that eminent domain proceedings were not instituted to accomplish a public purpose, such as the elimination of blight. Rather, the courts indicated that the sole purpose for acquiring the property through condemnation proceedings was to benefit another private entity.[41] Although, in these cases, the property to be condemned in each case was located in an area designated for redevelopment, the individual projects did not further redevelopment goals. Instead, the projects were simply expansions of existing business concerns. The businesses needed more parking or larger retail space and they wanted to acquire their neighbors' land to accomplish those purposes. When the neighbors did not agree, the businesses sought to use the redevelopment acts and em-

---

[39]*Midkiff,* 467 U.S. at 241 (quoting *Gettysburg Electric R'Y.,* 160 U.S. at 680).

[40]*Cf. Armendariz v. Penman,* 75 F.3d 1311, 1320-21 (9th Cir. 1996); *99 Cents Only Stores v. Lancaster Redevelopment,* 237 F. Supp. 2d 1123, 1128-31 (C.D. Cal. 2001); *Wilmington Pkg. Auth. v. Land W/Improvements,* 521 A.2d 227 (Del. 1986); *Southwestern Ill. Development Auth. v. NCE,* 710 N.E.2d 896 (Ill. App. Ct. 1999), *aff'd,* 768 N.E.2d 1 (Ill.), *cert. denied,* 537 U.S. 880 (2002).

[41]*99 Cents Stores Only,* 237 F. Supp. 2d at 1129-31 (eminent domain cannot be used solely to permit expansion of large retail store at expense of small retail business); *Wilmington Parking Auth.,* 521 A.2d at 234-35 (eminent domain improper where sole purpose was to permit newspaper to expand physical plant); *Southwestern Ill. Development Auth.,* 710 N.E.2d at 904 (no public purpose found where sole reason for eminent domain was expansion of raceway parking facilities).

inent domain to acquire the property.[42] The courts found a lack of substantial evidence to support the government's assertion that the project expansions were designed to combat physical, economic or social blight. There was no evidence that the areas in question suffered from high crime, unemployment, vacant business or other components of blight that would be addressed by the proposed projects.[43] In contrast, when a project is intended to attack blight, such as creating a significant increase in jobs in an area suffering from high unemployment, even the relocation of one business through condemnation to make way for a new business is still considered a public purpose.[44]

The creation of a public pedestrian mall and entertainment attraction is not the expansion of a business entity. The record reflects that the garage was not built to service a single business, but to address inadequate public parking in the downtown area and the need for new parking as visitor volume increased in response to the attraction. Although the attraction benefits the casino consortium that was willing to finance the project, its focus is to provide a safe, clean, and friendly environment for visitors and businesses in general and an anchor for revitalization of the entire downtown area. This constitutes a public purpose under the United States and Nevada Constitutions.

### Blight

The district court found that substantial evidence did not support the Agency's finding that the area in which the Pappases' property was located was blighted; therefore, the inclusion of this area in the redevelopment plan was improper and the property was not subject to eminent domain proceedings. Appellants contend that the district court lacked authority to consider this issue because all challenges to a redevelopment plan must be brought within ninety days of the plan's adoption.

"Blight" is a term used to describe physical, social or economic conditions that affect the health, safety or welfare of a commu-

---

[42]*See* cases cited *supra* note 41.

[43]*See* cases cited *supra* note 41.

[44]*Poletown Neighborhood Council v. City of Detroit,* 304 N.W.2d 455, 458-59 (Mich. 1981) (taking of property to facilitate construction of automobile plant permitted where area suffered from severe economic conditions and new industrial development was necessary to combat social and economic blight resulting from high unemployment).

nity.[45] There is no question that blight takes on many forms. Physical blight refers to a community's infrastructure, such as poorly designed streets, inadequate public facilities, building code violations, and substandard housing.[46] Slums are a common example of physical blight. Social blight incorporates such aspects as high crime or unemployment rates.[47] Economic blight involves downward trends in the business community, relocation of existing business outside of the community, business failures, and loss of sales or visitor volumes.[48]

For an area to be included in a redevelopment plan, there must be a finding that the general area suffers from some form of blight and that redevelopment is necessary to eliminate that blight.[49] If an agency's finding of blight is supported by substantial evidence, it is not subject to judicial review.[50] Substantial evidence is that which a "reasonable mind might accept as adequate to support a conclusion."[51]

In addition, judicial review of a redevelopment plan must be conducted within the timelines required by statute. NRS 279.609 provides that any challenge to the validity of a redevelopment plan must be raised within ninety days after the "adoption of the ordinance adopting . . . the plan." NRS 279.589(1) reinforces the finality of NRS 279.609, stating, "The decision of the legislative body concerning a redevelopment area is final and conclusive, and it is thereafter conclusively presumed that the redevelopment area is a blighted area and that all prior proceedings have been properly and regularly taken."

This language is taken from similar California redevelopment statutes, and we may therefore look to California's interpretations for guidance.[52] The California Supreme Court, interpreting a statute that provides for a sixty-day period to contest a redevelopment plan, has stated that judicial review of a finding of blight (and therefore public use) must be commenced within the statutory period.[53] Once the sixty-day period expires, no new action to chal-

---

[45]Berman, 348 U.S. at 31; Sweetwater Valley Civic Ass'n v. National City, 555 P.2d 1099, 1103 (Cal. 1976).

[46]Beach-Courchesne v. City of Diamond Bar, 95 Cal. Rptr. 2d 265, 270-71 (Ct. App. 2000).

[47]Id. at 271.

[48]Id.

[49]Sweetwater Valley Civic Ass'n, 555 P.2d at 1103.

[50]In re Bunker Hill Urban Renewal Project 1B, 389 P.2d 538 (Cal. 1964).

[51]State, Emp. Security v. Hilton Hotels, 102 Nev. 606, 608, 729 P.2d 497, 498 (1986) (internal quotation marks and citation omitted).

[52]Crockett, 117 Nev. at 824, 34 P.3d at 559.

[53]Sweetwater Valley Civic Ass'n, 555 P.2d at 1102-03.

lenge the findings may be filed, and a conclusive presumption of blight applies.[54]

The Plan in this case was not challenged within the ninety-day period provided by Nevada statutes; therefore, the district court erred in considering whether substantial evidence supported the determination that the downtown area suffered from physical, social or economic blight. Moreover, even if such a challenge had been timely made, the record reflects substantial evidence in support of the Agency's determination of blight. Specifically, evidence was presented to the Agency indicating that the downtown area, including the area in the immediate vicinity of the Pappases' property, suffered from higher crime rates than the rest of the City of Las Vegas. Vacant lots, burnt out buildings, and vacant buildings were present on many of the downtown blocks. Visitor volume had been consistently decreasing. Businesses were relocating outside of the downtown area. Most of the buildings in the area were over thirty years old and renovations would require substantial upgrades to comply with existing building codes. While the surveys and investigation may not have been as intensive as in some of the reported cases, they certainly provide substantial evidence of blight. Thus, the district court erred in finding the area was not blighted.

The Pappases further contend that even if the area in general can be considered blighted, their particular property was not blighted; therefore, it could not be subject to eminent domain. The United States Supreme Court rejected this type of argument in the seminal case of *Berman v. Parker.*[55] In *Berman,* the High Court stated, "Property may of course be taken for this redevelopment which, standing by itself, is innocuous and unoffending."[56] The Court further concluded, "If owner after owner were permitted to resist these redevelopment programs on the ground that his particular property was not [blighted] . . . integrated plans for redevelopment would suffer greatly."[57]

Although the area in *Berman* involved slums and an urban renewal statute, rather than a community redevelopment statute, its rationale still applies. The specific building at issue in *Berman* was not itself blighted.[58] The building was to be taken from a private

---

[54]*Id.* at 1103.

[55]348 U.S. 26 (1954).

[56]*Id.* at 35.

[57]*Id.*

[58]*Id.* at 31.

owner and managed by a private agency.[59] The Court concluded, however, that redevelopment encompasses an entire area, not just individually blighted sections.[60] The Court observed that the "piecemeal approach, the removal of individual structures that were offensive, would be only a palliative."[61] Through redevelopment "it was hoped that the cycle of decay of the area could be controlled."[62] Consistent with *Berman,* the fact that the Pappases' property itself was not blighted does not prohibit its taking through eminent domain proceedings.

We note, however, that while a property owner may not challenge a redevelopment plan's finding of blight beyond the ninety-day statutory deadlines, the issue of blight may still be raised as it relates to the specific project involved in a condemnation proceeding. A property owner may raise, as an affirmative defense to the taking, that blight originally identified in the plan or project no longer exists[63] or that the particular project is the product of fraud or collusion between the governmental agency and the private entities who will develop the project[64] or the avowed public purpose is merely a pretext[65] or used in bad faith.[66]

The record reflects no basis for any conclusion that economic, social or physical blight was eradicated between the date the Plan was adopted in 1988 and the date the Fremont Street Experience project was approved in 1993. To the contrary, tourism and visitor volume continued to decline in downtown Las Vegas during those years. More businesses had left the area or closed down. Crime rates, particularly drug- and prostitution-related crimes, continued to be a problem. Inadequate parking had increased. Thus, the Pappases failed to establish that downtown Las Vegas no longer

[59]*Id.*

[60]*Id.* at 34.

[61]*Id.*

[62]*Id.* at 35.

[63]*See 99 Cents Only Stores,* 237 F. Supp. 2d at 1130-31; *Aposporos v. Urban Redevelopment Com'n,* 790 A.2d 1167, 1175-77 (Conn. 2002).

[64]*See 99 Cents Only Stores,* 237 F. Supp. 2d at 1130-31; *Aposporos,* 790 A.2d at 1175-77; *see also Southwestern Ill. Development Auth.,* 710 N.E.2d at 896.

[65]*Earth Management, Inc. v. Heard County,* 283 S.E.2d 455, 459-61 (Ga. 1981) (condemnation was pretext to stop construction of hazardous waste disposal plant); *Armendariz,* 75 F.3d at 1320-21.

[66]*Pheasant Ridge Assoc. v. Burlington Town,* 506 N.E.2d 1152 (Mass. 1987) (eminent domain proceedings designed to block construction of low and moderate income housing); *Denver West Metro. Dist. v. Geudner,* 786 P.2d 434, 436 (Colo. Ct. App. 1989).

suffered from physical, social, or economic blight at the time of the eminent domain proceedings.

The same conclusion applies to any allegation of fraud, collusion, bad faith or pretext. The record contains no evidence that the Pappases' property was being acquired for some purpose other than a public parking facility and community redevelopment of a blighted downtown area. Because the record does not support the district court's finding of bad faith, we conclude the district court erred in basing its dismissal on this theory and relying on bad faith or pretext cases.

*Necessity*

In an eminent domain proceeding, necessity is usually raised in the context of challenging whether a project furthers a public purpose and therefore constitutes a public use. It involves whether the property to be taken is necessary to accomplish the public purpose[67] and it encompasses the selection of the location of the condemned land.[68] However, the standard for challenging a taking for lack of necessity is even greater than that for challenging its public purpose. Courts may not question the wisdom of how to accomplish the public purpose absent a showing of fraud or bad faith.[69] It is up to the legislative body (in this case, the Agency) to determine how to accomplish the public purpose. Thus, the courts may not substitute their own judgment or dismiss an eminent domain action simply because the legislative branch has other methods at its disposal to accomplish the public purpose.[70]

The district court found that the Agency acted in bad faith because it could have entered into long-term ground leases with all of the owners of property on the block needed to construct the parking garage rather than acquire the property through condemnation. However, the record contains no evidence to support such a finding. The record reflects that the Agency rejected this approach because it would severely affect the financing for the garage. There is no evidence to suggest any other reason for the decision. The Agency's condemnation decision does not constitute bad faith, and

---

[67]*Denver West Metro. Dist.,* 786 P.2d at 436.

[68]*Thornton Development Authority,* 640 F. Supp. at 1076.

[69]*Port of Umatilla v. Richmond,* 321 P.2d 338, 350-51 (Or. 1958); *Denver West Metro. Dist.,* 786 P.2d at 436; *Thornton Development Authority,* 640 F. Supp. at 1076.

[70]*Port of Umatilla,* 321 P.2d at 350-51; *Denver West Metro. Dist.,* 786 P.2d at 436; *Thornton Development Authority,* 640 F. Supp. at 1076.

the district court erred by substituting its judgment for that of the Agency as to the appropriate method for acquiring the property.

*Pappases' counterclaims*

The Pappases' counterclaims involved several concepts. They claimed that the Agency's inclusion of their property in the Fremont Street Experience project constituted inverse condemnation, that the Agency violated their due process rights during the initial motion for occupancy, and that their property was taken without just compensation. The record indicates no basis for these claims, and the district court correctly granted summary judgment on them. Issues of inverse condemnation and just compensation were subsumed within the original condemnation complaint. The Agency correctly followed the procedures for gaining immediate occupancy, and any alleged confusion generated by the pleadings was addressed in the Pappases' motion for reconsideration. Since they were given notice and an opportunity to be heard, due process was satisfied. Thus, the district court did not err in dismissing these counterclaims.

The Pappases also asserted a counterclaim seeking declaratory relief or damages for the Agency's alleged failure to permit them to participate in the project through a long-term ground lease. They base this assertion upon NRS 279.566(1).[71]

Pursuant to the statute, the Agency has enacted rules establishing guidelines for owner participation. The rules provide that the owners and tenants of real property in the redevelopment area are eligible to participate in the redevelopment of property within the area subject to certain factors, such as changes in zoning or land use regulations, street realignments, the ability of participants to finance acquisition, development or rehabilitation of their project, reduction in total number of individual parcels in the area, and construction of public facilities.[72] The rules also provide that the owners have a reasonable opportunity to retain their properties, acquire adjacent properties, sell and relocate, rehabilitate or participate in new development.[73] The Plan mirrors the rules by indicating that participation opportunities are necessarily subject to and limited by the same factors cited in the rules.[74]

[71]NRS 279.566(1) states:

Every redevelopment plan must provide for the participation and assistance in the redevelopment of property in the redevelopment area by the owners of all or part of that property if the owners agree to participate in conformity with the redevelopment plan adopted by the legislative body for the area.

[72]City of Las Vegas Downtown Redevelopment Agency, Rules Governing Participation § 300.

[73]*Id.* § 400.

[74]Redevelopment Plan for the Downtown Las Vegas Redevelopment Area § 410.2 (Jan. 22, 1986).

The plain language of the statute, rules and Plan does not give the Pappases an absolute right to participate in a particular project. It does permit landowners to propose a development project involving their property or to combine with other landowners on a project. It also mandates that such proposals be evaluated fairly. It does not, however, require the Agency to approve any proposal. California courts, when interpreting similar statutes and rules, have come to the same conclusion. The California Supreme Court has determined that there is no absolute right of owner participation in the redevelopment of any individual parcel in a redevelopment area.[75] Whether to allow owner participation in a given project, and under what circumstances, are matters left to the discretion of the agency.[76]

In this case, from the time their property was included in the redevelopment area until the approval of the Fremont Street Experience consistency project, the Pappases did not seek to participate in any redevelopment project utilizing their property. Once the property was identified as necessary for the parking garage, the Pappases did propose a long-term ground lease as an alternative to acquiring their property. Although initially inclined to consider this idea, the Agency rejected the long-term lease proposal when it became apparent that long-term leases would affect financing of the garage construction. No evidence was presented in opposition to the Agency's motion for summary judgment, indicating that the Agency's decision to forgo ground leases for the garage was the product of fraud or was not supported by substantial evidence. To the contrary, the only evidence presented on the issue demonstrated the need to have single ownership of the land to obtain favorable financing. The district court correctly concluded that no genuine issue of material fact existed as to this claim because no evidence was presented to indicate the Agency acted in bad faith when it rejected the ground-lease proposal.

Finally, the Pappases asserted causes of action relating to alleged rent losses incurred by them prior to the condemnation proceedings. The Pappases claimed that they lost rent from the time the Agency announced that the Pappases' property would be part of the Fremont Street Experience and that City or Agency employees interfered with the relationship between the Pappases and their ten-

---

[75]*In Re Bunker Hill,* 389 P.2d at 563.

[76]*Sanguinetti v. City Council of City of Stockton,* 42 Cal. Rptr. 268, 275 (Ct. App. 1965); *see also Fellom v. Redevelopment Agency,* 320 P.2d 884, 888-89 (Cal. Ct. App. 1958) (property owner has no right to participate where agency condemns property for redevelopment project).

ants. While much of the evidence presented by the Pappases in opposition to the Agency's motion for summary judgment consisted of inadmissible hearsay (what tenants allegedly told Carol Pappas), sufficient admissible evidence was submitted on this claim to raise a genuine issue regarding material questions of fact to survive a motion for summary judgment. Thus, we conclude the district court erred in dismissing these counterclaims.

## CONCLUSION

Substantial evidence supports the Agency's findings that the construction of the Fremont Street Experience, including the parking garage, furthers the public purpose of eliminating blight in downtown Las Vegas. Therefore, the Agency's use of eminent domain proceedings to acquire the Pappases' property for that purpose does not violate the Nevada or Federal Constitutions. The district court erred in dismissing the eminent domain action. With the exception of the claims involving pre-condemnation interference with tenants or rental opportunities, the district court did not err in dismissing the Pappases' counterclaims. Accordingly, we reverse the judgment of the district court dismissing the complaint in eminent domain and that portion of the district court's subsequent order pertaining to the lost rent claims and remand the matter to the district court for further proceedings in accordance with this opinion. The remaining portion of the district court's order dismissing the counterclaims is affirmed.

AGOSTI, C. J., SHEARING and ROSE, JJ., concur.

LEAVITT, J., dissenting:

The Agency's taking of the Pappases' property by eminent domain violates both the United States Constitution and the Constitution of the State of Nevada.

The United States Constitution states that no private property shall "be taken for public use, without just compensation."[1] The Constitution of the State of Nevada similarly provides that "[p]rivate property shall not be taken for public use without just compensation having been first made."[2]

The appropriation of a private citizen's property by eminent domain proceedings must be for a "public use" within the meaning of those words in the Constitution. The government's taking of property and giving it to another for a private use is unconstitutional and void.

The United States Supreme Court, in *Berman v. Parker,* upheld the transfer of property taken by eminent domain from one private

---

[1] U.S. Const. amend. V.

[2] Nev. Const. art. 1, § 8, cl. 6.

party to another private party; however, the taking in that case involved a public use.[3] The Court permitted the transfer of privately owned property to other private parties because the redevelopment area involved slums in Washington, D.C., and the conditions in the area were injurious to the public health, safety, morals and welfare.[4] This court, relying on *Berman,* previously upheld a redevelopment plan that was attempting to eradicate blight.[5]

Under Nevada law, a redevelopment area must include a "blighted area, the redevelopment of which is necessary to effectuate the public purposes."[6] The Pappases' property was not a slum. The City's survey gave no indication that the property was blighted in any way. There certainly were no conditions injurious to the public health, safety, morals and welfare. The property was adjacent to a savings and loan building and across the street from a bank. The redevelopment statute requires "[a]ll noncontiguous areas of a redevelopment area [to be] blighted or necessary for effective redevelopment" before adopting a redevelopment plan.[7] The Agency failed to demonstrate that the taking of the Pappases' property was necessary for effective redevelopment; it demonstrated only that it was desirable.

The California Supreme Court has concluded that "[a] finding of blight requires (1) that the area suffer 'either social or economic liabilities, or both, requiring redevelopment in the interest of the health, safety, and general welfare' and (2) the existence of one of the characteristics of blight."[8] In *Sweetwater Valley Civic Ass'n v. National City,* a redevelopment agency sought to take a golf course it considered blighted so that a private party could construct a shopping center.[9] The court concluded the agency lacked evidence of social blight and that the golf course was economically profitable; therefore, it was neither an economic nor social liability.[10]

Here, there was no evidence of blight in or around the Pappases' property; thus, the goal of eliminating blight, which in some cases may be a legitimate public use, is not applicable in this case. The Supreme Judicial Court of Massachusetts considered limitations on

---

[3]348 U.S. 26, 32-36 (1954) (transfer of property permissible to eradicate "slums" or "blight").

[4]*Id.* at 32-33.

[5]*Urban Renewal Agcy. v. Iacometti,* 79 Nev. 113, 121-22, 379 P.2d 466, 467 (1963).

[6]NRS 279.586(1)(a).

[7]NRS 279.586(1)(f).

[8]*Sweetwater Valley Civic Ass'n v. National City,* 555 P.2d 1099, 1103 (Cal. 1976) (quoting California statute governing redevelopment of blighted areas).

[9]*Id.* at 1100.

[10]*Id.* at 1104.

the acquisition of private lands and the definition of public use in a 1955 decision involving facts similar to these.[11] There, the Massachusetts Legislature proposed an act that would authorize the use of public funds to acquire private lands, to be followed by re-development of some portions for public use and the sale of the remainder to the highest bidder for private use.[12] The court held that the expectation that adjacent areas and the city as a whole would benefit from the taking did not constitute a public use.[13] The court further noted,

> [I]n dealing with this difficult subject one proposition is thoroughly established practically everywhere, and so far as we are aware without substantial dissent, and that is that public money cannot be used for the primary purpose of acquiring either by eminent domain or by purchase private lands to be turned over or sold to private persons for private use.[14]

Federal courts have agreed, particularly when the claimed public use is pretextual:

> "If officials could take private property, even with adequate compensation, simply by deciding behind closed doors that some other use of the property would be a 'public use,' and if those officials could later justify their decisions in court merely by positing 'a conceivable public purpose' to which the taking is rationally related, the 'public use' provision of the Takings Clause would lose all power to restrain government takings."[15]

The taking of the Pappases' property by the City of Las Vegas Downtown Redevelopment Agency under the pretextual guise of a "public use" is unconstitutional and void, since the plan was to give the property to the Fremont Street Experience, a private limited liability company, which would receive all revenues from the parking garage and retail space leases.

I would affirm the district court's dismissal of the case.

MAUPIN, J., dissenting:

I would affirm the result reached by the district court based upon my dissent in *Las Vegas Downtown Redevelopment v. Crockett.*[1]

---

[11]*In re Opinion of the Justices,* 126 N.E.2d 795 (Mass. 1955).

[12]*Id.* at 796-97.

[13]*Id.* at 803.

[14]*Id.* at 802.

[15]*99 Cents Only Stores v. Lancaster Redevelopment,* 237 F. Supp. 2d 1123, 1129 (C.D. Cal. 2001) (quoting *Armendariz v. Penman,* 75 F.3d 1311, 1321 (9th Cir. 1996)).

[1]117 Nev. 816, 34 P.3d 553 (2001).

*Amendment of the Plan*

The Fremont Street Experience, the redevelopment project in this matter, is subject to the same redevelopment plan and is within the same redevelopment area with which we were concerned in *Crockett*. Because I conclude that the signal feature of the project, the vacation of the oldest and one of the most traveled public boulevards in the city, effected a material change to or deviation from the governing redevelopment plan, I also conclude that the Agency improperly failed to seek formal amendment of the Plan before taking properties via eminent domain.

The *Crockett* majority held that the vacation of four streets and the relocation of a public park did not constitute a material deviation from or change to the redevelopment plan involved in this case. A fair reading of the majority opinion in *Crockett* supports the implied ruling by the majority in this case that resort to the formal amendment process provided for under NRS 279.608 was legally unnecessary. This notwithstanding, I remain of the view that *Crockett* was wrongly decided on its facts and should be revisited.

The redevelopment area in this case encompasses virtually the entirety of old downtown Las Vegas, bounded on the west by Martin Luther King Boulevard, on the east by Bruce Avenue, on the north by Washington Avenue, and on the south by Sahara Avenue. As noted by the majority in *Crockett,* the plan was approved to "eliminate and prevent the spread of blight and deterioration," contemplating acquisition of real property by purchase and by eminent domain, "transfer of acquired real property to public or private entities," and the "demolition of buildings . . . construction of parks, development and construction of hotel and 'tourism/recreational' facilities, and the widening, closure and vacation of streets and alleys" in the redevelopment area.[2] Although I agreed with the *Crockett* majority that redevelopment plan amendments are only necessitated when a proposed project entails a material deviation from the redevelopment plan, and although I agreed that formal amendment of a plan is not per se necessary to commence any project, I concluded that the vacation of parks and streets without formal plan amendment ran afoul of NRS 279.572 and NRS 279.608:

> The ability to amend under NRS 279.608 is quite specific in terms of the procedure to be followed. However, there are no stated criteria in this statute governing when the amendment process is required, other than the statement in subsection (3) that "substantial" changes must be submitted in a written recommendation for consideration by a city or county

[2]*Id.* at 819, 34 P.3d at 555.

government to amend the plan. Thus, I believe NRS 279.608 and NRS 279.572 must be read together to determine legislative intent. As noted, NRS 279.572 requires that redevelopment plans show open spaces, layout of streets, size, height, number and proposed use of buildings, number of dwelling units, property to be devoted to public purposes, other covenants, conditions, and restrictions, etc. While changes in the use of individual dwelling units and building sizes may involve mere details not requiring resort to the formal amendment process, vacation of streets and relocations of public parks depicted on the approved map are entirely different matters. Certainly, vacation of streets and relocation of parks are not ''details''. . . .[3]

Thus, while the plan in *Crockett* and in this case empowers the Agency to vacate public streets, as well as take other actions without resort to formal amendment of the plan, I am of the view that such powers are beyond those sanctioned in the statutory framework governing redevelopment unless the plan itself has been approved with the material changes sought. In *Crockett,* I also commented upon the Agency's need to promote flexibility and quick response to changing conditions. In doing so, I noted that the vacation of streets was not a measure that interfered with the need for expeditious action in response to changing economic conditions. I would also note that the assemblage of multiple parcels, as was done in this case to build the garage that now occupies the properties owned by the Pappas family, was likewise not done as a quick response to changing conditions. No one in this controversy has seriously suggested that the economic blight the City and the Agency sought to alleviate was anything other than a long-term developmental problem.

My vote to affirm is not based upon agreement with the district court's myriad justifications for dismissing the eminent domain action below, including its ruling that all redevelopment projects implicate the formal amendment process under NRS 279.608. Rather, it is based upon my view that, while there is no absolute requirement that redevelopment plans be formally amended to accommodate any redevelopment project, the nature of the project in question here mandated that the Agency submit to an amendment process prior to utilizing the power of condemnation to consolidate and assemble the affected parcels. In this, I note that the district court did not have the benefit of the *Crockett* decision when it determined that formal amendment of the Plan was a condition precedent to the exercise of eminent domain in this instance. However, as discussed below, because plans such as the 1986 Plan at issue

---

[3]*Id.* at 834, 34 P.3d at 565 (MAUPIN, C. J., dissenting).

here must of necessity be drafted in general terms, the requirement to amend should be fairly broad.[4]

*Blight issues and the amendment process*

Appellants claim that any issue of blight was conclusively resolved at the termination of the ninety-day protest period under NRS 279.609 following the adoption of the Plan in 1986, during which respondents took no action concerning the findings of blight within the redevelopment area. Respondents claim that evidence in support of the original determination of blight in the redevelopment area was flawed and insufficient. This, in fact, was one of the primary underpinnings of the district court's decision. To me, neither side has completely analyzed the procedural framework within which blight issues may be raised.

Appellants correctly argue that any questions regarding the problem of potential or existing generalized blight in the redevelopment area was conclusively established after expiration of the protest period following adoption of the original Plan. In my view, the district court relied too heavily upon the documentation it ordered produced concerning blight studies prior to the adoption of the Plan and the delineation of the redevelopment area in 1986. As noted by the Agency, the development of elaborate or comprehensive written documentation of blight was even unnecessary to a valid determination by the City that the redevelopment area as a whole contained widespread physical, social and economic blight. This was a decision that could be properly drawn from individualized knowledge of members of the Council who were in a position to judge the merits of the blight issue. Because no one lodged objection to the blight findings within the ninety-day period, any judicial tribunal must give deference to those findings. This deference, however, does not end the matter. Here, respondents could have reasonably concluded at the time that such a protest was unnecessary because the Plan did not establish that the Plan area suffered from blight in its entirety and that they could protest at a later time whether a particular project would meet the objectives of the Plan, *i.e.,* the alleviation of blight in their particular neighborhood and its environs. Going further, it is quite understandable that no individual landowner lodged formal objections either administratively or within the judicial system because of the daunting and probably prohibitively expensive task of challenging the validity of the entire Plan. Also, because ample justification existed to support the establishment of the downtown redevelopment area,

---

[4]Projects such as the Fremont Street Experience are extensive enough to require material changes to a redevelopment plan beyond simple vacation of streets, thus implicating the formal amendment process.

and because the mayor, city manager, members of the Council and at least one attorney representing the City made public assurances that the utilization of eminent domain to effect redevelopment projects would only come as a last resort, landowners in the area cannot be criticized or deprived of more discrete protest rights for not taking action against the Plan during the initial ninety-day period. Accordingly, while the respondents in this case have given up the right to contest the general resolution adopting the Plan and the blight findings inherent in it, they should still have been able to lodge objections in the context of a formal plan amendment concerning the Fremont Street Experience project on the grounds that takings pursuant to the amendment would not serve to alleviate blight in the neighborhood, *i.e.*, were inconsistent with the goals of the original Plan, or were not effected for public use. Whether they would have been successful may be doubtful, but they were still entitled to that forum. From there, these landowners could have sought administrative review in district court and litigated the issues they are trying to litigate now, long after the demolition of their property and the construction of the parking garage.[5] For these reasons, I feel *Crockett* too narrowly defines a redevelopment agency's duty to seek plan amendments to accommodate specific projects.

### General issues concerning redevelopment

The majority correctly concludes that a redevelopment plan or project serves a public purpose when the plan or project bears a rational relationship to the eradication of physical, social or economic blight, and that ultimate ownership of taken properties may be eventually assumed by other private interests if in aid of the public use. The majority also correctly concludes that non-blighted properties may be taken in support of an integrated plan of redevelopment to alleviate blight in a particular neighborhood or area.[6] The respondents agree with these propositions[7] but cling to the ar-

---

[5]*See Redevelopment Agency, Etc. v. Herrold,* 150 Cal. Rptr. 621, 625 (Ct. App. 1978).

[6]*See Berman v. Parker,* 348 U.S. 26, 32 (1954).

[7]The majority apparently misconstrues respondents' arguments in its recitation that respondents claim that the takings were illegal because their individual properties were not blighted and that eminent domain can never be used where the taking involves transfer of land from one private owner to another. My reading of respondents' arguments is that the project area, including their properties, was not blighted and that the taking here was not an integrated plan to alleviate blight in the area directly affected by the project; and that the transfers of property taken via eminent domain in *this* case were not consistent with the furtherance of a public use through redevelopment. Counsel for the respondents concedes that the utilization of eminent domain to effect redevelopment where taken properties are ultimately transferred to private entities is not per se violative of the Fifth Amendment to the Federal Constitution.

guments that there was insufficient showing of blight in the first instance, that the Fremont Street Experience was not "redevelopment," and that the transfer of the taken properties to the private entity here was a private benefit, not a public use.

In light of the above, I agree with the proposition that generalized blight issues and concerns in connection with the redevelopment area were conclusively established in 1986, that economic blight may be the subject of redevelopment effected via the use of eminent domain, and that, in Nevada, private entities comprised of hotel/casino properties may participate in a redevelopment project and therefore take title to redevelopment property acquired through the use of eminent domain. Thus, I disagree with the district court's findings below that this type of redevelopment cannot embody a public use or constitute redevelopment as a matter of law.

## CONCLUSION

While the district court erred in its conclusion of law that formal amendment is a condition precedent for *any* plan of redevelopment, the profound nature of *this* Plan required that *this particular* project go through the scrutiny of a formal amendment process. In this way, the affected landowners would have had a full opportunity to administratively air their views and have those views considered by the Agency prior to undertaking the project—views including whether the project was consistent with the elimination of physical and economic blight within the immediately affected area.

I would therefore affirm the result reached below.[8]

---

[8]I note that the traditional measure of damages prohibits the landowner from receiving damages based upon a post-taking evaluation or appraisal. Although we have never reached this issue, because this unique type of condemnation proceeding involves redevelopment and the transfer of private property to another private enterprise entity, it would be reasonable that the respondents be awarded damages based upon the upgraded value of the property caused by the redevelopment. To that degree, they would be receiving a fair benefit for their contribution to the redevelopment area. I urge the parties to explore this possibility on remand.